Oksana OLESZKO, Plaintiff–Appellant,

v.

STATE COMPENSATION INSURANCE FUND, David Howard, and Dora Cooke, Defendants–Appellees.

No. 99–15207.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 2000

Filed March 20, 2001

Peter G. Lomhoff, Oakland, California, for the plaintiff-appellant.

David L. Bacon, Thelen, Reid & Priest, Los Angeles, California, for the defendants-appellants.

Bruce Celebrezze and Graziella Walsh Coggan, Celebrezze & Wesley, San Francisco, California, for the defendants-appellees.

William F. Krebs, Galland, Kharasch, Greenberg, Fellman & Swirsky, Washington, D.C., for amicus curiae Employee Assistance Professional Associations, Inc., in support of defendants-appellees.

Before: D.W. NELSON, THOMPSON, and TROTT, Circuit Judges.

D.W. NELSON, Circuit Judge:

Oksana Oleszko appeals the denial of her motion to compel discovery from the State Compensation Insurance Fund's ("SCIF") Employee Assistance Program ("EAP").[1] The district court concluded that the federal psychotherapist-patient privilege protected the requested information from disclosure. *See Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

## BACKGROUND

This case arose from Oleszko's Title VII claim against the SCIF and her individual supervisors, in which she alleged sexual harassment, reverse race and national origin discrimination, and retaliation. Oleszko sought discovery from the SCIF's EAP in an attempt to show a pattern of sex and race discrimination and retaliation on the part of the SCIF. The SCIF's EAP refused to produce records or to testify about the substance of communications

with other employees on the ground that the communications were privileged under Federal Rule of Evidence 501 and the Supreme Court's holding in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337. The district court agreed and denied Oleszko's motion to compel discovery on June 5, 1997. Oleszko now appeals the district court's order denying discovery.

Employee Assistance Programs are worksite-based programs designed to assist employees in identifying and resolving personal issues, ranging from health, marital, and financial concerns to substance abuse and emotional problems. Employee Assistance Professionals Association Standards for Employee Assistance Programs, Part II: Professional Guidelines ("EAPA Standards") at 1. EAPs began in the 1970s as alcohol and drug treatment programs but have substantially broadened their scope and have become increasingly prevalent at all different types of workplaces. Michael T. French et al., Factors that Influence the Use and Perception of Employee Assistance Programs at Six Worksites, 2 J. of Occupational Health Psychol. 312, 312 (1997) ("Six Worksites"). Today, 45 percent of all full-time workers have access to EAPs. Terry C. Blum & Paul M. Roman, U.S. Dep't of Health and Human Servs., Cost–Effectiveness and Preventive Implications of Employee Assistance Programs ("Cost Effectiveness") 2 (1995). Over 17,000 employers have adopted EAPs. Brief of Amicus Curiae, Employee Assistance Professionals Association, at 2. The number of EAPs in Fortune 500 companies has more than tripled since 1972. Bureau of National Affairs, Inc., Employee Assistance Programs: Benefits, Problems, and Prospects 11 (1987). Ninety-five percent of such companies currently offer their employees counseling and referral services through EAPs. Paul M. Heck, *The Evolving Role of EAPs in Managed Behavioral Healthcare: A Case Study of Du-*

---

1. We address the remaining issues raised on appeal in a memorandum disposition filed concurrently.

*Pont, in* The Employee Assistance Handbook 291, 291 (James M. Oher ed., 1999).

EAP counselors help to resolve issues affecting employee health and well-being by providing comprehensive assessments and short-term counseling, referring clients for appropriate treatment where necessary, and providing follow-up services. Arlene A. Darick, *Clinical Practices and Procedures, in* The Employee Assistance Handbook 3, 4–12. EAPs have been shown to reduce absenteeism, on-the-job-accidents, and worker's compensation claims, and to improve work performance. Cost Effectiveness at 13.

The SCIF's EAP is staffed by a coordinator and three consultants. Although no one on the staff is a licensed psychiatrist, psychologist, or social worker, all of the consultants have backgrounds in psychology or social work, including relevant clinical and/or field experience.[2] In addition, all SCIF EAP staff members regularly participate in ongoing training and education on EAP-related issues.

Confidentiality is a key component of the EAP. According to the Employee Assistance Professionals Association, "EAPs are committed to maintaining confidentiality" and "[p]rogram success and credibility hinge, to a large extent, on employee confidence that the EAP respects individual privacy and adheres to confidentiality requirements and procedures." EAPA Standards at 2.[3] At the SCIF's EAP, that confidentiality policy is strictly enforced. Only EAP personnel have access to EAP files, which are kept in a locked cabinet in the EAP office, and all EAP records are shredded after five years.

## II.

## DISCUSSION

### A. The Psychotherapist–Patient Privilege: *Jaffee v. Redmond*

This case concerns the scope of the federal psychotherapist-patient privilege recognized by the Supreme Court in *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337. We must decide whether the district court erred in concluding that SCIF employee communications with EAP personnel are privileged. *See United States v. Blackman,* 72 F.3d 1418, 1423 (9th Cir.1995) (a district court's rulings regarding the scope of a privilege are reviewed de novo).

*Jaffee v. Redmond* involved a 42 U.S.C. § 1983 lawsuit against Mary Lu Redmond, a police officer who received extensive counseling from a licensed clinical social worker after she shot and killed a man while responding to a disturbance at an apartment complex. 518 U.S. at 4–5, 116 S.Ct. 1923. During discovery, the decedent's estate sought access to the social worker's notes from her counseling sessions with Redmond. *Id.* at 5, 116 S.Ct. 1923. The Supreme Court denied discovery of the notes, reasoning that the important public and private interests in protecting confidential communications to one's psychotherapist outweighed any evidentiary benefit that would result from denial of the privilege. *Id.* at 11–12, 116 S.Ct. 1923.

While the *Jaffee* decision created an absolute privilege for "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment" and extended the privilege to licensed social workers en-

---

**2.** Unlike the SCIF's program, many EAPs do have licensed psychologists, psychiatrists, or social workers on staff. *See* Brief of Amicus Curiae, at 3, n. 2 (noting that the licensed social worker who provided psychotherapy to the defendant in *Jaffee v. Redmond* was employed by the city's EAP).

**3.** Studies of employee attitudes toward EAPs support the EAPA's claim. At least two studies have shown that many employees view confidentiality as an important prerequisite to their use of an EAP. *See* Six Worksites at 323; Michael M. Harris & Mary L. Fennell, Perceptions of an Employee Assistance Program and Employees' Willingness to Participate, 24 J. of Applied Behavioral Sci. 423, 432, 434 (1988).

gaged in psychotherapy, *id.* at 15, 116 S.Ct. 1923, it explicitly left to later courts the task of "delineat[ing][the] full contours" of the privilege. *Id.* at 18, 116 S.Ct. 1923 (internal quotations omitted). The question we face is whether the psychotherapist-patient privilege recognized in *Jaffee* extends to unlicensed counselors employed by the SCIF's EAP. We hold that it does.

Although no federal circuit court has previously addressed this question, our conclusion that the psychotherapist-patient privilege extends to communications made to EAP counselors is supported by two district court opinions that have also extended the psychotherapist-patient privilege to unlicensed counselors. In *Greet v. Zagrocki,* 1996 WL 724933, *2 (E.D.Pa. 1996), the court held that EAP personnel were covered under the privilege recognized in *Jaffee.* *United States v. Lowe,* 948 F.Supp. 97, 99 (D.Mass.1996), extended the psychotherapist-patient privilege to rape crisis counselors who were neither licensed psychotherapists nor social workers but were under the direct control and supervision of a licensed social worker, nurse, psychiatrist, psychologist, or psychotherapist.

The contrary cases on which Oleszko relies are easily distinguished. In *Carman v. McDonnell Douglas Corp.,* 114 F.3d 790 (8th Cir.1997), the Eighth Circuit held that communications to an ombudsman employed to resolve workplace disputes without litigation were not protected by the psychotherapist-patient privilege. *Id.* at 791. The court concluded that the resolution of workplace disputes prior to litigation was not a sufficiently important interest to justify the creation of a new evidentiary privilege. *Id.* at 793. The EAP, by contrast, assists in resolving employees' mental health problems, which *Jaffee* unequivocally determined to be a "public good of transcendent importance." 518 U.S. at 11, 116 S.Ct. 1923.

Oleszko also argues that *United States v. Schwensow,* 151 F.3d 650 (7th Cir.1998), counsels against extending the psychother-

apist-patient privilege to EAPs. In *Schwensow,* the Seventh Circuit held that statements made to volunteer telephone operators at an Alcoholics Anonymous office were not protected by the psychotherapist-patient privilege because the volunteers did not act or hold themselves out as counselors, were not licensed or trained in counseling, and did not confer in a fashion resembling a psychotherapy session. *Id.* at 657. Unlike the telephone operators in *Schwensow,* the EAP's purpose is to provide counseling. EAP personnel are trained as counselors, are held out as counselors in the workplace, and, like psychotherapists, their job is to extract personal and often painful information from employees in order to determine how best to assist them.

## B. Extending the Psychotherapist–Patient Privilege

In extending the psychotherapist-patient privilege to licensed clinical social workers, the *Jaffee* majority concluded that "[t]he reasons for recognizing a privilege for treatment by psychiatrists apply with equal force to treatment by ... clinical social worker[s]." 518 U.S. at 15, 116 S.Ct. 1923. The Court focused on three main rationales for extending the privilege. First, it pointed out that social workers provide a significant amount of mental health treatment. *Id.* at 15–16, 116 S.Ct. 1923. Second, it explained that social workers often serve the poor and those of modest means who cannot afford a psychiatrist or psychologist, "but whose counseling sessions serve the same public goals." *Id.* at 16, 116 S.Ct. 1923. Third, the Court noted that the vast majority of states extend a testimonial privilege to licensed social workers. *Id.* at 16–17, 116 S.Ct. 1923.

The reasons for recognizing a privilege for treatment by psychiatrists or social workers apply equally to EAPs. EAPs, like social workers, play an important role in increasing access to mental health treatment. *Cf.* Six Worksites at 312 (describing the growth of EAPs since the

1970s). Growing numbers of EAPs help employees who would otherwise go untreated to get assistance. The availability of mental health treatment in the workplace helps to reduce the stigma associated with mental health problems, thus encouraging more people to seek treatment. EAPs also assist those who could not otherwise afford psychotherapy by providing and/or helping to obtain financial assistance.[4]

As a majority of the Supreme Court recognized in *Jaffee*, the provision of mental health services has significantly changed in the last quarter century. 518 U.S. at 16 n. 16, 116 S.Ct. 1923. EAPs embody what may be viewed as a team approach to providing mental health services. Thus, although EAP personnel at the SCIF do not engage in psychotherapy themselves, they serve as a primary link between the troubled employee and psychotherapeutic treatment.[5] As part of the mental health "team," they have access to much of the same highly sensitive information that is protected by privilege when revealed to a treating psychiatrist or social worker. To protect only disclosures made during psychotherapy while exposing those same disclosures to discovery when made to another member of the mental health team in order to access psychotherapy would significantly undermine the psychotherapist-patient privilege.[6]

Although the majority of state legislatures have yet to create a specific privilege for the confidential communications to EAP counselors, a number of states have begun to recognize such a privilege. *See* Conn. Gen.Stat. § 52–146n (West 2000) (recognizing a privilege for communications between state judicial department employees and EAP counselors); Ind.Code Ann. § 25–40–2–2 (West 2001) (recognizing a privilege for communications between a client and an employee assistance professional); N.H. Rev. Code Ann. § 21–I:52–a (2000) (confidential communications between state employees and EAP representatives are privileged); Or.Rev.Stat. § 181.860 (1999) (prohibiting confidential communications in a peer support counseling session for emergency service providers or law enforcement personnel to be used in adjudicatory proceedings); R.I. Gen. Laws § 28–6.8–1 (2000) ("No employer shall release the name, address, or otherwise breach the confidentiality of information obtained through an employee's participation in an employer assistance program, except where the information is related to a crime which must otherwise be reported by law."); Tenn.Code. Ann. § 62–42–115 (2000) ("The confidential relations and communications between a licensed employee assistance professional and client are the same as those provided by law for licensed psychologists, psychological exam-

4. Many companies even *require* assessment by an EAP before they will pay for mental health treatment for their employees. Ellen Schultz, *If Your Firm Uses Counselors, Remember Your Secrets Could Be Used Against You*, Wall St. J., May 26, 1994, at C1. Refusing to recognize an EAP-client privilege would force these employees to reveal confidences that would not be protected by privilege in order to access mental health treatment.

5. Unlike the social worker in *Jaffee*, personnel at the SCIF's EAP are not professionally licensed. Because of the rapid growth of EAPs, states are only just beginning to establish licensing requirements for EAP personnel. *See, e.g.*, N.C. Gen Stat. § 90–503; Tenn. Code Ann. § 62–42–104. There is currently no state licensing system for EAPs in California. As state laws begin to catch up with the rapid growth in EAPs, more states will un-

doubtedly establish licensing programs and state licensure may, in turn, become a more relevant factor in determining whether a particular EAP is legitimate.

6. This point becomes more clear if we consider an EAP, such as the one in *Jaffee*, whose staff includes licensed psychiatrists, psychologists, or social workers. In that case, sensitive information regarding an employee will likely be shared between unlicensed EAP counselors and licensed therapists on staff. Indeed, such an office would probably maintain one file containing the assessment and treatment notes for a given employee. To recognize a privilege only for the licensed counselors would force EAP personnel to choose between communicating with each other in order to provide the best possible treatment for the employee and protecting privileged information.

iners, physicians, and social workers.");
*see also Lara v. City of Albuquerque*, 126
N.M. 455, 458–59, 971 P.2d 846, 849–50
(Ct.App.1998) (including within the state
psychotherapist-patient privilege confiden-
tial communications to EAP counselors
made for the purpose of diagnosis or treat-
ment).[7]

## III.

## CONCLUSION

EAPs work to address serious national
problems, from substance abuse and de-
pression to workplace and domestic vio-
lence. Given the importance of the public
and private interests EAPs serve, the ne-
cessity of confidentiality in order for EAPs
to function effectively, and the importance
of protecting this gateway to mental health
treatment by licensed psychiatrists, psy-
chologists, and social workers, we hold that
the psychotherapist-patient privilege rec-
ognized in *Jaffee v. Redmond* extends to
communications with EAP personnel.

AFFIRMED.

7. Additional legislation at both the state and federal level also reflects societal recognition of the benefits of EAPs. The Drug Free Workplace Act of 1988 (41 U.S.C. § 701 et seq.) requires federal contractors and federal grant recipients to establish drug-free awareness programs which inform employees about the availability of EAPs. 41 U.S.C. §§ 701(a)(1)(B)(iii) & 702(a)(1)(B)(iii) (West 2001). A number of states have also implemented drug-free workplace statutes in order to maximize productivity and reduce the costs associated with substance abuse by employees. *See, e.g.,* Ala.Code § 25–5–330 (2001); Ark.Code Ann. § 11–14–101 (1999); Cal. Gov't Code § 19816.16 (West 2001); Fla. Stat. Ann. § 112.0455 (West 2001); Ga.Code Ann. § 34–9–410 (2000); Idaho Code § 72–1701 (2000); 30 Ill. Comp. Stat. Ann. 58⅗ (West 2001); S.C.Code Ann. § 44–107–30 (2000); Tenn.Code Ann. § 50–9–101 (2000). Similarly, a provision of the Small Business Act (15 U.S.C. § 631 et seq.) that provides aid to small businesses to establish drug-free workplace programs requires that such programs include employee access to confidential EAPs. 15 U.S.C. § 654 (West 2001). Recognizing the importance of EAPs in promoting the safety and productivity as well as the health and well-being of their employees, both the federal government and many states have implemented confidential EAPs for public employees. *See, e.g.,* 5 U.S.C. § 7904 (requiring that the head of each Executive agency establish an EAP for that agency); Fla. Stat. Ann. §§ 110.1091 & 125.585; Me. Rev. St. Ann. tit. 5 § 957 (West 1999); N.H.Rev. Stat. Ann. § 21–I:52–a (2000); Mass. Gen. L. Ann. ch. 7 § 28B (West 2000); Minn.Stat. Ann. § 43A.319 (West 2000); N.Y. Mental Hygiene Law § 41.54 (McKinney 2000); N.D. Cent.Code § 44–04–18.1 (1999); Okla. Stat. tit. 74 § 840–2.10 (2000); Wash. Rev.Code Ann. § 41.04.700 (West 2000).