**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steven Gene CHASE, Defendant–**
**Appellant.**

No. 01–30200.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 2002.

Filed Aug. 21, 2002.

Brett A. Purtzer, Law Offices of Monte E. Hester, Inc., P.S., Tacoma, WA, for the defendant-appellant.

Michael W. Mosman, United States Attorney, and Jeffrey J. Kent, Assistant United States Attorney, Eugene, OR, for the plaintiff-appellee.

Before: TROTT and T.G. NELSON, Circuit Judges, and SHADUR,* District Judge.

PER CURIAM Opinion; Dissent by Judge SHADUR.

PER CURIAM:

Steven Gene Chase ("Chase") timely appeals his jury conviction for violating 18 U.S.C. § 115(a)(1)(B) ("Section 115(a)(1)(B)") by threatening to murder federal law enforcement officers who were preparing to execute a search warrant on his home. Chase contends that the trial court erred (1) when it permitted his psychiatrist, in contravention of the psycho-

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

therapist-patient privilege, to give testimony on information she had learned during her therapy sessions with him, and (2) when it allowed the jury, in violation of Fed.R.Evid. ("Rule") 404(b), to hear testimony about asserted threats that Chase had made about individuals other than the federal law enforcement officers.

We hold that the district court correctly found that the psychiatrist's testimony was not barred by the psychotherapist-patient privilege, and that the court did not err in admitting evidence of other threats. Accordingly, we affirm the district court's judgment.

# I

## BACKGROUND

In 1997 Chase began receiving treatment for irritability, anger symptoms, and depression from psychiatrist Kay Dieter at a clinic in Salem, Oregon. Chase, who was receiving Social Security disability benefits due to his mental and physical problems, was later diagnosed with a bipolar type II disorder with episodes of intense anger and obsessive rumination against certain individuals. Chase met with Dr. Dieter every few months for counseling and medication management, seeing Psychologist Robert Schiff more frequently for psychotherapy. From the beginning of his treatment with Dr. Dieter, Chase had expressed anger and threats toward a number of people associated with his former business and legal proceedings. Chase exhibited a great deal of volatility during his therapy sessions, sometimes contrasting anger with mildness during the same session and often reflecting a sharp change in that respect from one session to the next.

During an August 18, 1999 counseling session, Chase showed Dr. Dieter his appointment book containing a list of names, addresses and social security numbers of people Chase had encountered in his business and legal dealings, including two FBI agents who had been assigned to investigate complaints that he lodged. Chase confided to Dr. Dieter that he had thoughts about injuring or killing those people and that he had threatened several of them on occasion during the previous five years. He also told Dr. Dieter that he had begun drinking.

As a result of that meeting Dr. Dieter became concerned about the possibility that Chase might act on his threats, although when she confronted him with her concerns Chase denied any intention to take immediate action. Dr. Dieter warned Chase that if he told her specifics about whom he planned to kill she would have a duty to alert those people. Following that meeting Dr. Dieter discussed with her supervisor her concerns as to Chase's ongoing threats and whether she had a duty to warn Chase's potential targets. Her supervisor suggested that she attempt to obtain more information from Chase before taking any action.

Dr. Dieter next spoke with Chase on October 18, when he called her to confide that he was extremely upset about an argument he had just had with his wife. During that conversation he also mentioned that his life insurance policy would pay off if anything should happen to him, a statement that caused Dr. Dieter to fear that he was losing his support system. Later that day Dr. Dieter again consulted with a supervisor and with the clinic's legal counsel, who instructed her to get in touch with the police department in the town where Chase lived. Dr. Dieter did that the next day, and on October 25 she heard from the FBI. She disclosed to FBI agents the threatening statements Chase had made during the therapy sessions and described whom he had threatened. Her supervisors instructed her to cooperate further by attempting to elicit more infor-

mation about Chase's plans during their next appointment on October 27.

At that appointment Dr. Dieter said nothing to Chase about her conversations with the authorities. Chase reported another fight with his wife and the fact that his mother had just been diagnosed with cancer. He continued to express his frustration with the legal system and said that if a lien against his house was not dropped by the time he met with his attorney the following Tuesday (November 2), "he would get his guns, get in his vehicle and have himself some justice." Chase told Dr. Dieter that he had located all but four of the people on his list and was targeting their children as well. Dr. Dieter again warned Chase about her obligation to alert Chase's intended targets, and Chase assured her that he would not act on any of his impulses.

FBI Agent Donald McMullen ("McMullen") spoke with Dr. Dieter on October 28, telling her that because of the information she had provided, the FBI was planning to interview Chase at his home and to execute a search warrant for weapons and for Chase's appointment book containing the names of his targets. Later that day Dr. Dieter received several voice mail messages from Chase indicating that he believed he was about to be arrested. Apparently Chase had received a telephone call from a neighbor who asked him why United States Marshals were questioning her about him and talking about arresting him. Chase spoke also with two of the clinic's telephone operators, telling one of them that "there are FBI Marshals that are on their way out to get me and if that happens, people are going to die." Dr. Dieter did not return Chase's calls, but she did call McMullen to warn him that Chase was aware that law enforcement people were coming.

After arriving outside of Chase's home, McMullen stopped Chase's wife from entering the home, and, in a series of cell phone negotiations involving Chase, his wife, and Chase's attorney, arranged for Chase to leave his gun on a table and step outside of his home. Chase then walked into his yard, assisted McMullen over a retaining wall, and permitted McMullen to handcuff him without incident. Chase told McMullen about the gun he had left on a table and the location of his appointment book, but he did not mention two other firearms hidden in the home. Chase said that when he told the clinic operator that people were going to die if the Marshals came to his home, he meant that *he* was going to die. Chase also referred to the statements he made to Dr. Dieter about killing people as "hypothetical."

Chase was arrested and charged on three counts: (1) threatening to murder federal law enforcement officers preparing to execute a search warrant at his home in connection with the statement he made to the clinic operator on October 28, (2) threatening to murder the FBI agents who in his view had failed properly to investigate his complaints, and (3) possession of firearms by a person adjudicated by the Social Security Administration as a mental defective. The last charge was subsequently dismissed by the district court.

Before trial, Chase challenged the admissibility of (1) Dr. Dieter's testimony about statements he had made during their counseling sessions and (2) evidence of threats he had made against individuals other than federal law enforcement officials. In holding Dr. Dieter's testimony admissible, the court concluded that the psychotherapist-patient privilege did not apply because Dr. Dieter had properly determined (1) that Chase's threats were serious when uttered, (2) that harm was imminent, and (3) that disclosure to authorities was the only means of averting the threatened harm. As for the evidence

of other threats related to the charge in Count II, the court deferred ruling until the trial, at which time it held that the evidence was admissible under Rule 404(b) as relevant to Chase's intent to retaliate against the agents for what he perceived to be their failure to take proper official action against his antagonists against whom he had filed complaints alleging federal offenses. We note that the defense did not request that 12256 Count I be severed from Count II for trial. The evidence in question can be summarized as follows:

- Parveen Gupta, Chase's former business associate, testified that Chase had enlisted the assistance of the police to carry out a meritless citizen's arrest of Gupta and his wife.
- Alex Myers, the Guptas' attorney, testified that Chase had played with a gun's magazine clip and its bullets (there was no gun involved—just the clip and bullets) while Myers took his deposition.
- Don Dickman and Ronald Palmeri, attorneys for Chase's former employee, testified about Chase's threatening and erratic behavior during the course of a lawsuit that the employee had filed against him.
- Monica Stauss, Dickman's secretary, testified that she had received a threatening telephone call from Chase.
- Sarria Hodge, a paralegal for one of Chase's former attorneys, testified that Chase had shown her a gun and threatened to "blow away" the sheriff, his wife's ex-husband, his former attorney and the entire law office.
- Two attorneys of Chase's wife's ex-husband testified that Chase knew personal information about them.
- Greg Kennedy, Chase's wife's ex-husband, testified that Chase possessed a handgun, had threatened to kill him, had made numerous false accusations about him to government entities and had vandalized and keyed Kennedy's car and that Chase "got back at" Kennedy's sister by naming her as a defendant in a lawsuit.
- John Beaudin, a private investigator, testified that Chase had hired him to find Kennedy and to locate the home of one of Kennedy's attorneys.

After deliberation, the jury convicted Chase on Count I and acquitted him on Count II.

## II

### STANDARDS OF REVIEW

We review de novo rulings by a trial court on the scope of a privilege. *Oleszko v. State Comp. Ins. Fund,* 243 F.3d 1154, 1156 (9th Cir.) *cert. denied,* —— U.S. ——, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001). We also review de novo the question whether particular evidence falls within the scope of Rule 404(b). *United States v. Smith,* 282 F.3d 758, 768 (9th Cir.2002). When evidence falls within Rule 404(b), we review for abuse of discretion a district court's decision to admit that evidence under Rule 403. *Id.*

## III

### ADMISSIBILITY OF DR. DIETER'S TESTIMONY

*Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), confirmed that a psychotherapist-patient privilege exists under federal common law. *Jaffee* held "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." 518 U.S. at 15. While *Jaffee* left the delineation of the scope of that privilege to future cases, it noted:

Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id.* at 18 n. 19.

While we have not previously considered the meaning of that footnote,[1] other circuits that have done so have reached opposite conclusions. In *United States v. Glass*, 133 F.3d 1356, 1360 (10th Cir.1998), the Tenth Circuit recognized a "dangerous patient" exception to the privilege—one that permits a therapist to disclose a threat if "the threat was serious when it was uttered and . . . its disclosure was the only means of averting harm . . . when the disclosure was made." In contrast, the Sixth Circuit has refused to recognize a dangerous-patient exception to the federal evidentiary privilege. *See United States v. Hayes*, 227 F.3d 578, 584–87 (6th Cir. 2000). The Sixth Circuit articulated a distinction between the professional duty a therapist may have to warn the target of a patient's threats and the evidentiary privilege that prevents the therapist from testifying about such threats in a later prosecution. In so doing, *Hayes* read the *Jaffee* footnote as "no more than an aside by Justice Stevens to the effect that the fed-eral psychotherapist/patient privilege will not operate to impede a psychotherapist's compliance with the professional duty to protect identifiable third parties from serious threats of harm," and not as marking out an exception to the evidentiary privilege. *Id.* at 585.

■ We find the *Hayes* dissent more persuasive than the majority opinion or the like position taken by the Oregon Supreme Court in *State v. Miller*, 300 Or. 203, 709 P.2d 225, 236 (1985).[2] *See Hayes*, 227 F.3d at 587–89. Just as the ethics of the profession recognize a "dangerous patient" exception to the psychotherapist's obligation of confidentiality that permits disclosure of otherwise-confidential information when (1) a threat of harm is serious and imminent and (2) the harm can be averted only by means of disclosure by the therapist, we hold that the same exception extends to the psychotherapist's permitted testimony under the same circumstances. This holding is faithful both to the *Jaffee* footnote and to the obvious policy considerations that underlie it.

■ At oral argument, Chase conceded that the privilege includes a dangerous patient exception but argued that the exception did not apply to this case because the threat was not immediate and because alternate means existed for Dr. Dieter to avert harm. In response the government contends that Dr. Dieter's disclosure and

---

1. *Oleszko*, where we held that the psychotherapist-patient privilege extended to communications between employees and Employee Assistance Program counselors, is the only case in which we have addressed the scope of the psychotherapist-patient privilege enunciated in *Jaffee*. *Oleszko*, 243 F.3d at 1159.

2. *Miller* recognized much the same distinction as did *Hayes* between a therapist's duty to warn a potential victim and the evidentiary privilege preventing disclosure of confidential information at trial. It should be noted, however, that the Oregon Supreme Court rested its decision in material part on the legislature's having enacted a specific crime-fraud exception to the attorney-client privilege, while creating no such exception to the psychotherapist-patient privilege. In any event, while *Jaffee* commented on the desire for comity between state and federal law on issues of privilege, it confirmed that it is of course federal common law and not state law that governs evidentiary privileges. *Jaffee*, 518 U.S. at 12–13. We hold Dr. Dieter's testimony admissible under federal common law.

subsequent testimony were proper because all evidence suggested that Chase imminently planned to murder many people and because reporting that to authorities was the only possible way to avert that harm.[3]

Following a hearing on the issue, the district court found that Chase presented imminent danger of causing serious harm to others and that Dr. Dieter's disclosure to authorities was the only means of averting that harm. That corresponds directly to the dangerous patient exception to the privilege, and our de novo review of the record compels us to affirm those findings. Although Chase's expressed hostility toward many individuals throughout the course of his treatment with Dr. Dieter had never resulted in his acting out any threats, Dr. Dieter could reasonably have viewed its most recent manifestations as posing a more serious problem. Chase had shown her the list of names in his appointment book, had told her about steps he had taken to track down his victims, had mentioned his life insurance policy and had described other stresses in his life, including alcohol consumption and arguments with his wife.

We need not decide here what will suffice to lower the bar for admissibility of a psychotherapist's testimony as to otherwise privileged communications—for example, whether the psychotherapist's sub-jectively perceived prospects of imminent harm could be adequate, or whether instead such perception must be objectively reasonable. Those boundaries for operation of the *Jaffee* footnote are better left for future case development. For the present it is enough to say that Dr. Dieter's view of the situation can fairly be considered to have been reasonable in itself.

Without conceding harm was indeed imminent, Chase argues that other means of averting potential harm were available—most notably involuntary civil commitment. Dr. Dieter testified that she considered initiating civil commitment procedures but concluded that it was unlikely that Chase would be held for longer than 72 hours due to his lack of a committable mental illness. Dr. Dieter was also concerned about a prior threat Chase had made to harm himself or clinic staff if any attempt were made to hospitalize him against his will. Thus, we find that Dr. Dieter reasonably considered disclosure to law enforcement authorities to be the only effective means of averting harm. We therefore affirm the district court's findings and hold that Dr. Dieter's testimony about information regarding the charged threat that she learned during Chase's therapy sessions was not protected by the psychotherapist-patient privilege.[4]

**3.** In its brief the government also urges that we find Chase's statements admissible under the crime-fraud exception to the privilege as recognized by *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 72 (1st Cir.1999). That argument fails because the crime-fraud exception as articulated in *Violette*, paralleling the crime-fraud exception that we have recognized in attorney-client privilege cases, applies only to communications that are intended "to promote a particular crime or fraud"—"directly to advance a particular criminal or fraudulent endeavor"—instead of serving the goals of legitimate therapy. *Violette*, 183 F.3d at 77; *see also United States v. Alexander*, 287 F.3d 811, 816–17 (9th

Cir.2002) (analyzing the crime-fraud exception in the context of attorney-client privilege). Here Chase's statements to Dr. Dieter were nothing of the sort—rather they were well within the scope of legitimate therapy.

**4.** We therefore find it unnecessary to reach the government's further argument that Chase would have forfeited the privilege in any event by consenting to the release of his medical information for insurance and disability benefits purposes or by failing to heed Dr. Dieter's warnings of her obligation to disclose. In that respect, parenthetically, we consider such arguments as more precisely framed in terms of forfeiture than waiver,

## IV

### ADMISSIBILITY OF EVIDENCE OF OTHER THREATS

■ Chase contests also the decision of the district court to admit evidence of threats Chase made against individuals other than federal agents. Chase argues that the evidence is of "other acts" than those charged in the underlying offenses and was therefore inadmissible under Rule 404(b) because the acts "were used to infer that [he] had a propensity to commit the crime charged, which is an improper use of such evidence." We respectfully disagree.

To counter the argument that evidence of other threats was inadmissible under Rule 404(b), the government contends that the rule is irrelevant here because the "other act" evidence was "inextricably intertwined" with the underlying offense and therefore exempted from Rule 404. Like other courts, we have recognized the potential inapplicability of Rule 404(b) in situations involving inextricably intertwined evidence. *United States v. Matthews*, 240 F.3d 806, 817 (9th Cir.2000), adopted by, 278 F.3d 880, 884 (9th Cir.) (en banc) *cert. denied*, —— U.S. ——, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002). Two types of "other act" evidence fit that description: (1) evidence of part of the transaction on which the criminal charge is based and (2) evidence required "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.* (quoting *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012–13 (9th Cir.1995)). As we have explained, a jury "cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *Vizcarra–Martinez*, 66 F.3d at 1013 (internal quotations omitted).

### A.

The first key to understanding Judge Hogan's well supported and careful decision to allow into evidence the disputed testimony is to recognize why Chase was angry at the F.B.I. agents. His intent to retaliate against them stemmed directly from his anger at the people entangled in his affairs who, for one warped reason or another, he did not like. The F.B.I. agents became involved in this thicket only because Chase tried unsuccessfully to enlist their official support to investigate his foes. To quote from the Government's Optional Trial Memorandum in support of the admissibility of this evidence,

> Thus, the evidence above explains why Chase wanted to kill the two FBI agents on his target list—in Chase's view, for the failure to adequately investigate and prosecute his enemies who he now intended to kill.
>
> All of these matters also are probative whether a reasonable person (here, the FBI agents) would take the threats against them seriously. *See United States v. Orozco–Santillan*, 903 F.2d 1262, 1265 (9th Cir.1990).

One can only understand this case by comprehending this fact: No problems with his antagonists, no retaliation against the F.B.I. The government made this abundantly clear in a lengthy discussion with the court concerning the relevance and admissibility of the evidence, starting first with an explanation of the threat alleged in Count II of the indictment:

> BY MR. KENT (the prosecutor): And I want to read from [Count II], because I—I think it sets out what our theory of the threat is.
>
> We were asked, what was the time period of the threats against the FBI

though the latter word is employed by the government: "Waiver" denotes the voluntary

surrender of a right or privilege, which was certainly not the case here.

agents? We indicated it would be sometime during or after the defendant's first known contact with the FBI on October 24, 1995, requesting the FBI to investigate the Guptas for bankruptcy fraud, and continuing during FBI Special Agent Gordon McDonald's oversight of an investigation of defendant's bankruptcy attorney, Elizabeth Levine, regarding allegations of bankruptcy fraud, and during and/or after Special Agent David McLean's August 25, 1998, interview of the defendant in connection with that investigation. The identity of the agents are Gordon McDonald and David McLean.

The threats were witnessed by Dr. Kay Dieter throughout the period of her treatment which the defendant expressed, which raged against the FBI agents for not adequately responding to his demands that the Guptas and Levine be investigated and charged with bankruptcy fraud. Dr. Dieter, of course, testified at the recent evidentiary hearings and provided further insight in the nature of these threats.

It would also be the government's theory that Agents McDonald and McLean appeared on the defendant's hit list, along with other agents, or along with other targets, whom the defendant targeted for a variety of reasons, and that he intended to kill all the people on that list including the agents.

Now, up until really now, we have not been able to review, in any significant way, the material from Dr. Dieter's file. So, you know, we're—we assume, consistent with her testimony at that motion to suppress, that she will testify that one of the areas of anger for Mr. Chase was his frustration that the FBI Agents McDonald, and to a lesser extent, McLean, had not acted sufficiently on information that he provided regarding misconduct of others. So that's the threat we're talking about.

THE COURT: In count—

MR. KENT: Or threats, you know.

THE COURT:—two?

MR. KENT: In count two. I mean, in other words, my belief is that Dr. Dieter would testify that, as was true with the Guptas, as was true with McHann, as was true with Levine, that he fixated on the failure of the FBI agents, particularly Gordon McDonald, to investigate and prosecute these, in quotes, federal crimes that he brought to their attention. And he showed Dr. Dieter a list that included the agents' names as among the people he intended to go out and kill if things didn't go his way that week in court.

So that is the nature of the threat that we expect to prove. We expect that it would have been repeated time and again to Dr. Dieter in the course of her—in the course of her treatment of Mr. Chase.

Later, the prosecutor recapitulated for the court the essence of his case:

You know, that's it in a nutshell, Your Honor, as far as how we intend to establish why Mr. Chase intended to threaten and kill, first the Guptas, who he complained to the FBI about; then McHann, who he complained to the FBI about; then Kennedy, who he complained to the FBI about; and then Levine, who the FBI was already investigating in connection with Chase's bankruptcy. And when nothing was done, in the view of Mr. Chase, to kill the FBI agents themselves who appear on the list.

### B.

The second key to analyzing the admissibility of the disputed evidence is found in 18 U.S.C. § 115(a)(1)(B), the statute under which Chase was prosecuted and convict-

ed. The statute makes it a crime for a person to threaten to assault a federal law enforcement officer "with *intent to retaliate* against such ... officer on account of the performance of official duties ...." § 115(a)(1)(B) (emphasis added). "Retaliate," is defined as "to return like for like," or "to return evil for evil." Webster's Third New International Dictionary 1938 (1976). How can anyone determine accurately whether and why Chase spoke with the "intent to retaliate" against these agents without knowing what he was retaliating against and its connection to the agents' official duties? This statute explicitly makes the reason for the threat an essential ingredient of the offense.

### C.

Judge Hogan demonstrated during the pretrial conference a thorough grasp of (1) the issues in this case, (2) what the government had to prove, which included an intent to retaliate, and (3) his responsibility to protect the defendant from improper evidence:

BY JUDGE HOGAN: Now, let's get to the other counts. To prove the threat counts, the government must prove that in the District of Oregon the defendant first threatened to assault, kidnap or murder; second, a federal law enforcement officer; three, with the intent to impede, intimidate, interfere with, or retaliate against that officer; and, four, while the officer was engaged in or on account of performance of his official duties.

I've taken the elements in this case from United States versus Orozco–Santillan. Now, whether a particular statement may properly be considered a threat is governed by an objective standard; and that is, whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. And the only intent requirement is that the defendant intentionally or knowingly communicate the threat, not that he or she intended or was able to carry it out.

*The state of mind and actions of a person being threatened, taken in response to the threats, is highly relevant as to whether the threats could reasonably be construed as containing a threat of injury.*

But the threat need not necessarily be expressly communicated to the object of the threat. Only that that would have been a reasonable consequence.

The threat—alleged threat need be such that a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm or take the life of the object of the threat.

Now, this—because intent here will be a principal question for the jury, evidence related to that threat, because it was a threat allegedly, *this alleged threat was allegedly made against government agents because they were not taking appropriate action with regard to other situations involving the defendant, and so on that issue of intent, the other situations are relevant.*

And while it may not be utilized to prove a propensity to crime, only concerning intent, the challenge before us is appropriately limited 404(b) evidence and *balancing it with 403* to allow the government to tell the story but not to take focus off what the alleged threat here is.

We're not going to, in other words, try a lot of threats, we're going to try one threat.

And we'll go into the other information with the government only insofar as

it may be useful in proving intent upon the threats that are charged in the indictment.

Now, I'd be happy to have—so we're going to have to look at that evidence in advance here. And I'd be happy to—Mr. Kent, for you to give me a suggestion on the most economical way to do that.

(emphasis added).

The defense recognized the relevance of this disputed evidence, suggesting an alternative method to bring it to the attention of the jury, a method later partially embraced by the court:

> MS. McCREA (defense counsel): If the government needs to show and is entitled to show that there was a *background which would relate to Mr. Chase's intent toward these two particular FBI agents, the two FBI agents Gordon McDonald and David McLean* are listed as witnesses for the government, certainly they could come in and testify regarding the bankruptcy fraud investigation of Elizabeth Levine, the other bankruptcy fraud claims against the Guptas, McHann, and Kennedy initiated by Mr. Chase, and give the jury that background themselves in, arguably, a detached, neutral and professional fashion, instead of hashing up and rehashing these previous litigations.

(emphasis added). At another point, Ms McCrea said, "So some background would clearly be appropriate, but without going into all of the hysterical emotional aspects."

At the conclusion of counsels' presentations on this issue, Judge Hogan exhibited again his command of the situation:

> THE COURT: Ms. McCrea, some of this—I'm going to allow at least some of this evidence as intent evidence or having to do with the issue of intent. And what I do invite you to do is to draft a form of jury instruction to caution the

jury against its misuse. And I can go ahead and do that myself by writing something extraneously, but I invite you to do so if you want to, because it is material that could be misused, and I think the warning ought to be rather strong.

Judge Hogan adopted the defense's suggestion that much of the disputed evidence would come in through the F.B.I. agents in summary fashion:

> THE COURT: We're going to handle the 404(b) evidence as follows: I prefer to be able to give you rulings on each item of evidence before we actually start the trial. I'm not able to do that here, but I am going to order much of what was summarized in the proffer is relevant on the issue of intent. Some of it is not. What I am going to do is require the government to put on the FBI agents who were working these issues before the other witnesses. And I will limit the other witnesses if they begin to get cumulative of the FBI material. If there is information that the agents cannot testify to, then I may allow some evidence from other witnesses. And so I would expect much of this material to come in in summary fashion, and from those named FBI agents.
>
> MR. KENT: Gordon McDonald and Agent McLean?
>
> THE COURT: Uh-huh.

Given the language of the statute under which Chase was charged in Count II, there is no principled way to see this disputed evidence of motive and purpose as not relevant; it is inextricably intertwined with Chase's ire against the FBI agents, who had rejected all his unfounded referrals, and with his threats against them. Retaliation was the focus of Count II. It is as simple as this: the retaliation of today cannot be shown without proof of what happened yesterday when the person mak-

ing the threat was allegedly wronged by the person threatened. This evidence was the very essence of the charge described in Count II, and it illuminates Chase's intent with respect to Count I.

### D.

But, the story of Judge Hogan's proper exercise of his discretion is far from over. Contemporaneously with the admission of the disputed evidence during the trial, he carefully admonished the jury as to the limited use to which it could be put:

> I do want to make a comment to the jury.
>
> I told you about the alleged threats that are being prosecuted by the government here. Now, it's the government's theory—we've heard—that at least some of those *threats were in retaliation, kind of a retaliatory threat because the FBI didn't do enough about other situations, including the one you are hearing about now.* But this case is not about whether this witness was threatened or these other situations. This is about whether the government agents were threatened. And I'm only allowing this evidence on these unrelated matters insofar as it may offer something useful to you concerning the defendant's intent, which is something the government is required to prove in the case.
>
> All right. Go ahead, Mr. Kent.

(emphasis added).

Before he submitted the case to the jurors for their decision, Judge Hogan repeated again these instructions:

> Testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and should not be considered. In addition, some testimony and exhibits have been received only for a limited purpose. *Where I have given a limiting instruction, you must follow it* . . . .

You have heard evidence of other actions, encounters, or statements by the defendant. This evidence is not proof of the crimes charged. You may consider this evidence only as it bears on defendant's *motive or intent and for no other purpose.*

> The defendant is on trial for the charges in the superceding indictment, not for any other activities. You are here only to determine whether defendant is guilty or not guilty of the charges in the superseding indictment. The defendant is not on trial for any other conduct or offense not charged in the superseding indictment. You should consider evidence about the acts, statements and intentions of others, or evidence about other acts of the defendant, only as they relate to these charges against this defendant.

(emphasis added).

Then, Judge Hogan gave the jurors an instructional statement of the law, to which there is no objection on appeal:

> A threat is an expression of an intention to inflict evil, injury, or damage on another. *Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners.*
>
> Whether a particular statement may properly be considered to be a threat is governed by an objective standard, whether a reasonable person would foresee that the standard would be interpreted by those to whom the maker communicates the threat as a *serious expression of intent to harm or assault.*
>
> The defendant must intentionally or knowingly communicate a threat, but the government need not show that the defendant intended or was able to carry out the threat. It is not required that the defendant communicate the alleged threats to the objects of the alleged

threats. *It is, however, necessary for the government to prove that the defendant intended to impede, intimidate, interfere with, or retaliate against the object of the alleged threats.*

(emphasis added). This correct statement of the law, taken from the statute and from our opinion in *United States v. Orozco–Santillan,* 903 F.2d 1262 (9th Cir. 1990), puts an end to any claim that the disputed evidence was not relevant.

It was for this reason, grounded in the statute itself, that we said in *Orozco–Santillan* that "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." 903 F.2d at 1265. Reducing this abstraction to the facts, we then said in that case that in order to decide whether what Orozco–Santillan said was a threat, his utterances "must be considered in context. Vela had arrested Orozco–Santillan and subjected him to deportation proceedings. In these circumstances a rational jury could conclude that Orozco–Santillan's statement made on the telephone was a threat." *Id.* at 1266.

## V

## CONCLUSION

We affirm the district court in all respects. The district court's decision concerning the admissibility of Dr. Dieter's testimony was correct, as was its decision to admit the evidence of Chase's confrontations with others.

AFFIRMED.

SHADUR, District Judge, dissenting in part.

Because I read the record through a very different lens than do my colleagues, I respectfully dissent as to the affirmance of the conviction as discussed in Part IV of the per curiam opinion (Parts I through III accurately reflect my own views on the aspects of the case that are dealt with there). When the evidence and the prosecutor's closing argument are placed alongside the charge in Count I—the only criminal charge of which Steven Chase ("Chase") stands convicted—I believe that Chase received a profoundly unfair trial on that count.

Whenever a criminal defendant confronts multiple charges, just as whenever multiple defendants confront the same charge, a jury is asked to conduct what amounts to multiple simultaneous trials. In that respect the district judge here properly charged the jury with the standard instruction that is Ninth Circuit Model Instruction 3.12:

A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

But unfortunately the vast bulk of the trial testimony and the overwhelming majority of the prosecutor's closing argument were devoted to wrongs and acts other than the threat that was the gravamen of Count I—wrongs and acts that demonstrated Chase to be a thoroughly unpleasant man but did not qualify as proper Fed.R.Evid. ("Rule") 404(b) evidence *on that count.* And although we always presume that juries heed and abide by cautionary instructions, what was totally absent here was any instruction that such evidence—carrying as it did the high potential for unfair prejudice, the potential for its being treated as "bad man" character evidence that Rule 404(b) is intended to keep out of a criminal case, lest a defendant be convicted for things that he or she has done other than the express charge at issue—should not be considered on the Count I charge.

It may be, as the majority opinion states, that the overwhelming mass of evi-

dence of other threats and vengeful statements by Chase that were introduced by the government was admissible to show his *motive* for the Count II charge of retaliation against FBI agents. Indeed, what strikes me as extraordinary about the majority opinion is that its entire substantive discussion—the reference to "inextricably intertwined" evidence, the extended quotation from the prosecutor's statement of his theory of prosecution and the equally extended quotation from the district judge's pretrial conference statement—relates exclusively to Count II, *not* to Count I (which is the only charge before us). All that is said about Count I is this (after referring to the massive evidence of Chase's other threats and statements, none of which he ever acted on):

> This evidence was the very essence of the charge described in Count II, and it illuminates Chase's intent with respect to Count I.

But significantly, the jury acquitted Chase on Count II even in the face of that "other acts" evidence—though what flaw the jury found in the government's proof on that charge we cannot know, because jury deliberations are secret. And that made it all the more important that the jury be told properly of the limitations on the use of such evidence as between the two charges. On that score the district judge mistakenly held only that the evidence was admissible under Rule 404(b) as relevant to Chase's *intent,* contrary to this Circuit's teaching as to the only intent that is required to be shown when a defendant is charged under 18 U.S.C. § 115(a)(1) with making a threat (*United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 n. 3 (9th Cir.1990) and cases cited there)—and, moreover, that ruling was made without the district judge's having engaged in the required Rule 403 balancing analysis as to Count I.

It is really impossible to overstate the extent of the resulting imbalance as to Count I, which must be the focus of our present review. Most of the evidence at trial (and indeed the conduct by Chase that the prosecutor first mentioned in his opening statement, and to which he devoted the bulk of his closing argument even before he turned to the claimed threats against the officers on which the indictment was based) related not to Count I's charged offense, but rather to the "other acts" category that looked to Rule 404(b) for admissibility as to Count II. Because that evidence has been set out at the end of Part I of the per curiam opinion, it suffices here simply to recite the parade of witnesses whose testimony was presented to the jury with no indication of its lack of relationship to Count I: Gupta, Myers, attorneys Dickman and Palmeri and two other attorneys, Stauss, Hodge, Kennedy and Beaudin. And as I have said earlier, that same imbalance marked the prosecutor's closing argument, with the bulk of his emphasis being devoted to matters other than Count I's actual charge of threats against the law enforcement people.

That being the case, the jury was bombarded with volumes of irrelevant evidence that painted a detailed picture of Chase as an individual who has a propensity to threaten others. No fewer than 14 of the government's 22 witnesses testified about Chase's threats other than the ones charged, and the prosecutor heavily emphasized that evidence in his opening statement and closing argument instead of focusing on the evidence directly relevant to the actual threats charged in the two counts. And the government left no doubt as to its reason for that emphasis—here is the prosecutor's pretrial statement stressing the desire to prove *why* Chase had uttered (though he had never acted on) those other threats that were not a compo-

nent of the charged offense (emphasis added):

> *We intend to establish why Mr. Chase intended to threaten and kill, first the Guptas,* who he complained to the FBI about; *then McHann,* who he complained to the FBI about; *then Kennedy,* who he complained to the FBI about; and *then Levine,* who the FBI was already investigating in connection with Chase's bankruptcy. And when nothing was done, in the view of Mr. Chase, to kill the FBI agents themselves who appear on the list.

All of that being so, I believe that the overwhelming amount of that propensity evidence more probably than not compromised the jury's ability to assess reliably the one question that it needed to answer to decide whether Chase was guilty of the Count 1 charge: Would a reasonable person have foreseen that Chase's October 28 telephone statement would be interpreted as a real threat (in *Orozco–Santillan* terms) by the person who heard it? And to me that propensity evidence cannot qualify as harmless error as to the only count at issue. "Harmless error" is a concept developed by appellate courts to embody and implement the truism that no litigant is assured of a perfect trial, but only a fair one (a doctrine applicable to criminal and civil trials alike—*see, e.g., United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) and cases cited there).

Harmless error analysis, when applied to the improper admission of evidence at trial, normally involves minor surgery—the figurative excision of such testimony by scalpel, followed by an examination of the remaining evidence to see whether the same result would assuredly follow. Here the figurative excision would extend to the elimination of the bulk of the corpus via meat cleaver, so that it is particularly appropriate for a jury and not a reviewing court to evaluate the remaining (and untainted) evidence.

Some errors will almost inevitably occur in the pressure cooker that typifies virtually every contested trial, and it would be impossible to administer a judicial system in which every trial court error, no matter how minor or how noncritical to the outcome, would automatically trigger a new trial (let alone a reversal). But what I believe plainly emerges from the transcript here is that the district judge's improper admission of such a large body of "other acts" evidence coupled with the manner in which the prosecutor capitalized on that situation by focusing primary attention on how bad a person Chase was, rather than on the charged offense, rendered Chase's trial on Count I fundamentally unfair for the reasons I have set out here. Essentially Chase was ultimately tried on, and his Count I conviction inexorably flowed from, actions and unconsummated threats other than those charged in the indictment. And that to me takes the harmless error doctrine out of play.

Hence I believe that Chase's Count I conviction should be reversed and the case should be remanded for a new trial free of the taint described here. As stated earlier, I respectfully dissent on that ground.