**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven Gene CHASE, Defendant–
Appellant.**

**No. 01–30200.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted En
Banc March 25, 2003.

Filed Aug. 22, 2003.

Brett A. Purtzer, Law Offices of Monte
E. Hester, Inc., Tacoma, WA, for the de-
fendant-appellant.

Jeffrey J. Kent, Assistant United States Attorney, Eugene, OR, for the plaintiff-appellee.

Before: SCHROEDER, Chief Judge, and PREGERSON, T.G. NELSON, KLEINFELD, THOMAS, GRABER, McKEOWN, W. FLETCHER, FISHER, GOULD, and CLIFTON, Circuit Judges.

Opinion by Judge GRABER; Concurrence by Judge KLEINFELD.

## OPINION

GRABER, Circuit Judge:

A jury convicted Defendant Steven Gene Chase of violating 18 U.S.C. § 115(a)(1)(B) after he made a threat against agents of the Federal Bureau of Investigation. The jury acquitted him of a charge involving threats to other FBI agents. The threat underlying Defendant's conviction was expressed to a telephone operator at a Kaiser Permanente clinic. The threats as to which Defendant was acquitted were communicated, during therapeutic sessions, to his psychiatrist, who testified about them.

On appeal, Defendant argues that the psychotherapist-patient privilege precluded the psychiatrist's testimony about what he told her during therapeutic sessions. We agree and hold that the privilege applied; we decline to craft a "dangerous patient" exception to the testimonial privilege. Thus, the district court erred in admitting the psychiatrist's testimony regarding threats that Defendant had related during treatment. Nonetheless, we affirm Defendant's conviction, because the error was harmless.

## BACKGROUND

Defendant began receiving treatment at Kaiser Permanente from psychiatrist Kay Dieter in 1997. He was suffering from irritability, depression, and symptoms of anger. Defendant experienced, among other things, episodes of rage and obsessive rumination against certain people, including those who participated in various legal proceedings in which Defendant was involved. Eventually Defendant was diagnosed with bipolar type II disorder. He received disability benefits due to his psychiatric condition. Defendant met with Dr. Dieter every couple of months for therapy and for management of his medication. Defendant met more often (ranging from bi-weekly to monthly) with psychologist Robert Schiff for psychotherapy.

During a counseling session on August 18, 1999, Defendant showed Dr. Dieter his day planner, which contained a list of names, addresses, and social security numbers. The list included two FBI agents who had investigated complaints lodged by Defendant. Defendant confided to Dr. Dieter that he had thought about injuring or killing these people and that he had threatened some of the listed individuals several times during the preceding five years.

Dr. Dieter became concerned that Defendant might act on his threats. Defendant told Dr. Dieter that he had no intention to act immediately on his homicidal thoughts. Nonetheless, Dr. Dieter warned Defendant that if he told her specifics about whom he planned to kill, she would have a duty to disclose the threats to the intended victims so that they could protect themselves.

Following this session, Dr. Dieter discussed with one of her supervisors her concerns regarding Defendant's threats. She asked whether she had a duty to warn potential victims. The supervisor suggested that Dr. Dieter try to elicit more information from Defendant before taking any further action.

On October 18, 1999, Defendant called Dr. Dieter to tell her that he had argued

with his wife and was extremely upset. Defendant told Dr. Dieter that he had a life insurance policy that would pay off if anything should happen to him. Fearing that Defendant was losing his support system, Dr. Dieter met with a supervisor and with Kaiser Permanente's legal counsel to discuss again whether Defendant's threats should be disclosed. Legal counsel advised Dr. Dieter to contact the local police department in Corvallis, Oregon, Defendant's home town. Dr. Dieter contacted the Corvallis police on October 19. On October 25, agents of the FBI got in touch with her. She disclosed to the FBI agents the threatening statements that Defendant had made during therapeutic sessions and identified the people whom Defendant had threatened. Dr. Dieter's supervisors instructed her to continue to cooperate with the authorities and to attempt to elicit more information about Defendant's plans during their next appointment.

Defendant and Dr. Dieter met again on October 27. Dr. Dieter did not tell Defendant about her disclosures to the authorities or her instructions from her supervisors. Defendant related the details of another fight with his wife and told Dr. Dieter that his mother had just been diagnosed with cancer. Defendant reiterated his frustration with the legal system (including the FBI, which Defendant complained was not protecting him adequately) and said that, if a lien against his house was not dropped by the time he met with his lawyer on November 2, "he would get his guns, get in his vehicle and have himself some justice." Defendant told Dr. Dieter that he had gathered more information on the people he intended to kill and that he had located all but four of those on his list. Dr. Dieter repeated her admonition regarding her duty to warn Defendant's intended victims. Defendant alternated between claiming that he did not have any plans to act immediately and reiterating his threats.

On October 28, FBI Agent Donald McMullen spoke with Dr. Dieter and told her that the FBI was planning to interview Defendant and to execute a search warrant on his home, looking for weapons and the day planner containing the list of threatened individuals. Later that day, Defendant left several voice-mail messages for Dr. Dieter, telling her that he believed he was about to be arrested. (Apparently a neighbor of Defendant's, who was curious about why United States Marshals were questioning her about Defendant and speaking of arresting him, had called Defendant.) Defendant also spoke with two of the clinic's telephone operators, telling one that "there are FBI Marshals that are on their way out to get me and if that happens, people are going to die." Dr. Dieter did not return Defendant's calls. Instead, she notified Agent McMullen to alert him to the fact that Defendant knew that the authorities were on their way.

Agent McMullen and his team went to Defendant's home but, before proceeding, called for backup. Defendant's wife arrived while the agents were waiting. The agents prevented her from entering the house. A series of cell-phone negotiations ensued, involving Defendant, his wife, and his lawyer. Finally, a deal was struck whereby Defendant would put his gun on a table and leave the house. As agreed, Defendant walked into his yard, assisted McMullen over a wall, and allowed himself to be handcuffed. Defendant told McMullen about the gun on the table and about the location of the day planner; Defendant did not mention two other firearms that were hidden in the house. Defendant said that when he told the clinic operator that people were going to die if the agents came to his home, he meant that *he* would die. Defendant also referred to the threatening statements conveyed to Dr. Dieter as "hypothetical."

Defendant was arrested and charged on three counts: Count I (threatening to murder federal law enforcement officers who were preparing to execute a search warrant on his home); Count II (threatening to murder the FBI agents who, he complained, had failed to investigate his earlier complaints properly); and Count III (possession of firearms by a person adjudicated by the Social Security Administration to be mentally defective). The district court dismissed Count III before trial.

At trial, Defendant challenged the admissibility of (1) Dr. Dieter's testimony relating to statements that Defendant had made during therapeutic sessions and (2) evidence of threats that he had made against individuals other than federal law enforcement officers. The district court held that Dr. Dieter's testimony was admissible. The court reasoned that the federal psychotherapist-patient privilege did not apply because Dr. Dieter properly had determined that Defendant's threats were serious when uttered, that harm was imminent, and that disclosure to authorities was the only means of averting the threatened harm. The district court also held that evidence of other threats was admissible under Federal Rule of Evidence 404(b). The court determined that this evidence was relevant under Count II to Defendant's intent to retaliate against FBI agents for their perceived failure to investigate appropriately the people against whom Defendant had filed complaints.

Dr. Dieter testified at trial. She recounted the therapeutic sessions in which Defendant had threatened FBI agents and others (the basis of Count II). Two Kaiser Permanente telephone operators testified to the conversations they had with Defendant while federal agents were en route to his home (the basis of Count I).

Following the trial, the jury convicted Defendant on Count I (threatening the agents who were en route to execute the search warrant) but acquitted him on Count II (the threats communicated during sessions with Dr. Dieter). Defendant timely appealed his conviction, arguing that admission of Dr. Dieter's testimony violated the psychotherapist-patient privilege and that other-acts evidence was improperly admitted under Rule 404(b). A three-judge panel of this court affirmed the district court's evidentiary rulings and affirmed the conviction. *United States v. Chase*, 301 F.3d 1019 (9th Cir.2002) (per curiam). We then agreed to rehear this case en banc. 314 F.3d 1031 (9th Cir. 2002).

## STANDARD OF REVIEW

We review de novo the ruling of a district court on the scope of a privilege. *Oleszko v. State Comp. Ins. Fund*, 243 F.3d 1154, 1156 (9th Cir.), *cert. denied*, 534 U.S. 892, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001).

## DISCUSSION

To answer the ultimate question whether Dr. Dieter's testimony was properly admitted and, if not, whether Defendant is entitled to a reversal of his conviction, we will answer a series of four subsidiary questions:

- Was Defendant's communication to Dr. Dieter of threats to third parties a confidential communication that, ordinarily, is subject to a federal testimonial privilege? We answer that question "yes."
- Did Dr. Dieter properly disclose the threats to law enforcement personnel? Again, our answer is "yes."
- Did Dr. Dieter's disclosure destroy the federal testimonial privilege? Our answer is "no." We hold that there is no dangerous-patient exception to the federal psychotherapist-patient testimonial privilege.

• Does the district court's error in allowing Dr. Dieter to testify about what occurred during therapeutic sessions require us to reverse Defendant's conviction? We answer "no" to this final question. Because the jury acquitted Defendant of the threats to which Dr. Dieter testified and because, on this record, the outcome on the count of conviction would have been the same without her testimony, we hold that the error was harmless.

A. *Defendant's communication to Dr. Dieter was confidential under state law and privileged under both state and federal law.*

■ At the outset, we differentiate two distinct concepts: confidentiality and testimonial privilege. By "confidentiality," we refer to the broad blanket of privacy that state laws place over the psychotherapist-patient relationship. By "privilege," we mean the specific right of a patient to prevent the psychotherapist from testifying in court.

All 50 states and the District of Columbia have enacted laws protecting psychotherapist-patient confidentiality. *See* 3 Jack B. Weinstein & Margaret E. Berger, Weinstein's Federal Evidence § 504.03[4][b], at p. 504–11 & n. 12 (2d ed.1997, Release No. 67–02/00) (listing statutes). These laws commonly perform two functions: They establish a testimonial privilege, and they also create a more general blanket of confidentiality to cover the relationship in all contexts. A psychiatrist who is subject to such a law may not testify in court as to therapeutic conversations with her patient; neither may she gossip about them with her grocer.

Oregon, where Defendant received treatment from Dr. Dieter, is no exception. Confidentiality is protected by statute.

*See, e.g.,* Or.Rev.Stat. § 677.190(5) (listing as a ground for revocation or suspension of a medical license the divulging of a patient's confidences); 2003 Or. Laws ch. 86, § 1 (H.B.2305) (stating legislative policy to protect patients' medical records from disclosure); Or.Rev.Stat. §§ 109.675–.695 (allowing minors 14 years of age or older to obtain diagnosis and treatment of, inter alia, a mental or emotional disorder, without parental knowledge or consent in most circumstances); Or.Rev.Stat. § 430.399(5) (providing that records of a drug— or alcohol-treatment facility shall not be revealed without the patient's consent); *see also Humphers v. First Interstate Bank,* 298 Or. 706, 696 P.2d 527 (1985) (explaining sources of confidentiality requirement). A concomitant state-court testimonial privilege is provided in Oregon Evidence Code § 504(2):

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

Defendant's statements were made in the course and scope of treatment. Accordingly, Defendant's communications to Dr. Dieter were confidential under state law (although an exception permitted disclosure of certain parts of the communications, as we explain below). That is so even though the threats that Defendant communicated arguably constituted a crime. Once Defendant finished uttering the threats, the charged crime was completed, and the psychiatrist was in the same position she would have occupied had her patient described a bank robbery in which he had participated a week earlier.[1]

---

1. This case does not involve threats to the

psychotherapist herself, so we need not de-

Defendant's disclosures to his psychiatrist also were subject to a testimonial privilege in federal court, unless some exception applies. Federal Rule of Evidence Rule 501 states in part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

"Reason and experience" are the "touchstones" for acceptance of a privilege under Rule 501. *Jaffee v. Redmond*, 51 F.3d 1346, 1355 (7th Cir.1995), *aff'd*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

■ The Supreme Court, resolving a circuit split, first recognized a psychotherapist-patient privilege in *Jaffee*. There, the Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Id.* at 15, 116 S.Ct. 1923. In arriving at its conclusion, the Supreme Court acknowledged that testimonial privileges generally are disfavored, but observed that a testimonial privilege may be justified by a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.* at 9 (internal quotation marks omitted).

The *Jaffee* Court paid particular attention to the experience of the states. The determination "[t]hat it is appropriate for the federal courts to recognize a psychotherapist privilege under Rule 501 is confirmed by the fact that all 50 States and

the District of Columbia have enacted into law some form of psychotherapist privilege." *Id.* at 12, 116 S.Ct. 1923. The Court reaffirmed the principle that "the policy decisions of the States bear on the question whether federal courts should recognize a new privilege," *id.* at 12–13, and observed that, "[b]ecause state legislatures are fully aware of the need to protect the integrity of the factfinding functions of their courts, the existence of a consensus among the States indicates that 'reason and experience' support recognition of the privilege," *id.* at 13. Additionally,

> given the importance of the patient's understanding that her communications with her therapist will not be publicly disclosed, any State's promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court. Denial of the federal privilege therefore would frustrate the purposes of the state legislation that was enacted to foster these confidential communications.

*Id.* (footnote omitted).

Moreover, the privilege is justified independently by important private and public interests. As to the private interest served by the privilege, the Court recognized that

> a psychiatrist's ability to help her patients "is completely dependent upon [the patients'] willingness and ability to talk freely. This makes it difficult if not impossible for [a psychiatrist] to function without being able to assure ... patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule ..., there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment." Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972).

cide whether such communications would be similarly confidential or privileged.

*Id.* at 10–11, 116 S.Ct. 1923 (other citation and internal quotation marks omitted).

As to the public interest served, the Court recognized that "[t]he psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.* at 11, 116 S.Ct. 1923.

Despite its seemingly sweeping endorsement, the Court in *Jaffee* declined to delineate the "full contours" of the psychotherapist privilege. *Id.* at 18, 116 S.Ct. 1923. In a footnote that presaged the issues presented to us today, the Court noted:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id.* at 18 n. 19, 116 S.Ct. 1923.

We read that footnote as endorsing—albeit elliptically—a duty to disclose threats to the intended victim and to the authorities, the issue to which we turn next.[2]

### B. *Dr. Dieter properly disclosed the threats to the authorities.*

■ Most states have a dangerous-patient exception to their psychotherapist-patient confidentiality laws. *United States v. Hayes,* 227 F.3d 578, 583 (6th Cir.2000).

Some of these exceptions allow, and some require, a psychotherapist to disclose threats made by a patient during therapeutic sessions if the psychotherapist determines that the patient poses a risk of serious harm to self or others. This exception is often referred to as the *Tarasoff* duty, *see, e.g.,* George C. Harris, *The Dangerous Patient Exception to the Psychotherapist–Patient Privilege: The Tarasoff Duty and the Jaffee Footnote,* 74 Wash. L.Rev. 33 (1999), after the California case that first introduced it. *See Tarasoff v. Regents of Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 340 (1976) ("When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.").

Oregon recognizes this exception to the rule of confidentiality. Under Oregon law, a provider of mental health care may disclose "[i]nformation obtained in the course of diagnosis, evaluation or treatment of an individual that in the professional judgment of the health care services provider, indicates a clear and immediate danger to others or to society." Or.Rev.Stat.

---

**2.** As we will explain, most states have strong rules of psychotherapist-patient privilege that prevent a psychotherapist from testifying about the content of therapeutic sessions. Nevertheless, many states permit psychotherapists contemporaneously to disclose (for example, to the police) threats made by a "dangerous patient" in order to protect intended victims. We believe that the *Jaffee* footnote was intended to extend this nontestimonial disclosure rule to psychotherapist-patient relationships to which federal law applies (such as treatment by federally employed psychologists at overseas army hospitals).

§ 179.505(12), *amended by* 2003 Or. Laws ch. 88 (H.B.2307).

In the circumstances of this case, we have no doubt that Dr. Dieter properly disclosed the threats that Defendant had related regarding several specific individuals. Even if we were wrong in that conclusion, however, a state-law breach of psychotherapist-patient *confidentiality* would not necessarily lead to an abrogation of the federal *testimonial privilege*.

The Federal Rules of Evidence apply only to proceedings in federal court. *See* Fed.R.Evid. 101 ("These rules govern proceedings in the courts of the United States and before the United States bankruptcy judges and United States magistrate judges, to the extent and with the exceptions stated in rule 1101."). Dr. Dieter's disclosure to law enforcement personnel occurred long before any federal court proceedings had commenced. If her disclosure were improper, then Defendant might have a civil remedy in state court, *see Humphers,* 696 P.2d at 533 ("A number of decisions have held that unauthorized and unprivileged disclosure of confidential information obtained in a confidential relationship can give rise to tort damages."), or Dr. Dieter might be answerable to the Oregon Board of Medical Examiners, which disciplines psychiatrists for violations of ethical rules, *see* Or.Rev. Stat. § 677.205 (2001). But Rule 501 is not implicated by an improper disclosure made outside of federal court proceedings.

The more difficult question under Rule 501 is what effect a *proper* disclosure may have: In other words, whether we should recognize a dangerous-patient exception to the federal *testimonial privilege* arising out of, or coextensive with, the dangerous-patient exceptions to states' rules of *confidentiality.* We turn next to that question.

C. *We decline to recognize a dangerous-patient exception to the federal testimonial privilege.*

■ We are faced with an even split between the two circuits that have considered the question under Rule 501. That is, whether we decide that there is a dangerous-patient exception to the federal psychotherapist-patient privilege, or that there is not, we will have company.

The Tenth Circuit has said that a psychotherapist may testify about a threat made by a patient if "the threat was serious when it was uttered and ... its disclosure was the only means of averting harm ... when the disclosure was made." *United States v. Glass,* 133 F.3d 1356, 1360 (10th Cir.1998). This is the approach that the district court and the three-judge panel took. *Chase,* 301 F.3d at 1024.

By contrast, the Sixth Circuit has held that there is no dangerous-patient exception to the psychotherapist-patient privilege. *Hayes,* 227 F.3d at 585–86. We agree with the Sixth Circuit for the four reasons that follow.

1. *The States' Experiences*

The *Tarasoff* duty, by definition, lifts the blanket of *confidentiality* covering psychotherapist-patient communications under state law. Ordinarily, however, the *Tarasoff* duty does not abrogate the *testimonial privilege* in state courts. *Id.* at 585. Generally, the psychotherapist may (or must) warn the authorities or the intended victims of a dangerous patient, but still may not testify to confidential communications in state-court proceedings.[3] Of the states

---

**3.** Many states carve out separate testimonial exceptions, which permit psychotherapists to testify at commitment hearings and other identified proceedings. *See, e.g.,* Cal. Evid. Code § 1004 ("There is no privilege under this article in a proceeding to commit the patient or otherwise place him or his property, or both, under the control of another because of his alleged mental or physical condition.").

in the Ninth Circuit, only California has an *evidentiary* dangerous-patient exception. *See id.* (explaining that California is alone in the nation in enacting a dangerous-patient exception in its law of evidence). In California, a psychotherapist not only must disclose to authorities or intended victims the existence of a dangerous patient, but also may testify to threats made in the course of therapy. *See* Cal. Evid. Code § 1024 ("There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger.").

Almost all the states, then, recognize the distinction between confidentiality (which is affected by the *Tarasoff* duty) and testimonial privilege (which is not). In Oregon, where Defendant resided, received psychiatric treatment, and was convicted, the distinction has been explained this way by the state's supreme court:

> It is important to distinguish between the evidentiary privilege which is claimed by a patient, or a psychotherapist in behalf of a patient (OEC 504(3)), to prevent disclosure of confidential information *at trial,* and the discretionary authority of a public health care provider or any ethical obligation that a licensed psychotherapist may have to notify the police or other proper authority in order to aid a victim or warn of future dangerousness. The public interest to be served by notifying the police, in most cases, could be achieved by divulging only that information needed to show why a clear and immediate danger is believed to exist. It would rarely justify the full disclosure of the patient's confidences to the police, and never justify a full disclosure in open court, long after any possible danger has passed.

*State v. Miller,* 300 Or. 203, 709 P.2d 225, 236 (1985) (footnote omitted). Had Defendant been prosecuted in state court, Dr. Dieter could not have testified about what Defendant told her during therapeutic sessions, notwithstanding her permissible disclosure of threats to the authorities. *See also State v. Wilkins,* 125 Idaho 215, 868 P.2d 1231, 1235 (1994) (defining Idaho's testimonial privilege and reversing a conviction where a psychotherapist testified at sentencing to threats made by the defendant during therapy).

The states' experiences are relevant in two ways. First, the states' experiences are instructive in themselves, *see Jaffee,* 518 U.S. at 12, 116 S.Ct. 1923, especially when they are nearly uniform over a significant period of time. Second, a dangerous-patient exception affirmatively would weaken state confidentiality laws. The Supreme Court reasoned in *Jaffee* that refusing to recognize a federal psychotherapist-patient privilege would undermine the states' confidentiality laws. *Id.* at 13, 116 S.Ct. 1923. Exceptions to the federal privilege, where state laws contain no parallel exception, would have a similar effect. A state's promise of confidentiality has less value if the patient knows that an exception to the privilege applies in federal court.

### 2. Differing Purposes of State Confidentiality Laws and the Federal Testimonial Privilege

As we have just explained, the states themselves disconnect confidentiality from the testimonial privilege. Similarly, the Sixth Circuit has opined that it would be a mistake to view

> the standard of care exercised by a treating psychotherapist prior to complying with (or, for that matter, failing to comply with) a state's "duty to protect" requirement is somehow pertinent

to the applicability of the psychotherapist/patient privilege in criminal proceedings. We think there is little correlation between those two inquiries.

*Hayes,* 227 F.3d at 583. The Sixth Circuit continued, saying that it saw

only a marginal connection, if any at all, between a psychotherapist's action in notifying a third party (for his own safety) of a patient's threat to kill or injure him and a court's refusal to permit the therapist to testify about such threat (in the interest of protecting the psychotherapist/patient relationship) in a later prosecution of the patient for making it. State law requirements that psychotherapists take action to prevent serious and credible threats from being carried out serve a far more immediate function than the proposed "dangerous patient" exception. Unlike the situation presented in *Tarasoff,* the threat articulated by a defendant [who makes a threat in the course of therapy] is rather unlikely to be carried out once court proceedings have begun against him.

*Id.* at 583–84. We agree with the Sixth Circuit for two reasons, one theoretical and the other practical.

As to the first of those considerations, analytically there is little connection between a psychotherapist's state-imposed obligation to report a dangerous patient at the time the patient makes a threat, on the one hand, and the later operation of the federal testimonial privilege, on the other. The *Tarasoff* duty is justified on the ground of protection; the societal benefit from disclosing the existence of a dangerous patient out-weighs the private and public cost of the deleterious effect on the psychotherapist-patient relationship. By contrast, ordinarily testimony at a later criminal trial focuses on establishing a past act. There is not necessarily a connection between the goals of protection and proof. If a patient was dangerous at the time of the *Tarasoff* disclosure, but by the time of trial the patient is stable and harmless, the protection rationale that animates the exception to the states' confidentiality laws no longer applies.

Second, as a practical matter, the fact that different states have different standards regarding when a psychotherapist must (or may) breach confidentiality by disclosing a patient's threats counsels against hinging the *Jaffee* testimonial privilege on the protective disclosure laws of the states. For example, Washington's exception to the confidentiality requirement allows for disclosure by a psychotherapist "[t]o appropriate law enforcement agencies and to a person, when the identity of the person is known to the public or private agency, whose health and safety has been threatened, *or who is known to have been repeatedly harassed,* by the patient." Wash. Rev.Code § 71.05.390(10) (emphasis added). By contrast, in California, when a psychotherapist "determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger." *Tarasoff,* 131 Cal.Rptr. 14, 551 P.2d at 340.

Those standards are materially different. In Washington, a therapist has permission to disclose conversations if the patient has repeatedly harassed someone, even if the psychotherapist does not think that the patient presents a "serious danger of violence." In California, a patient who engages in similar harassment retains the confidentiality because the patient does not present a "serious danger of violence." If the federal evidentiary privilege were tied to the states' disclosure laws, then similarly situated patients would face different rules of evidence in federal criminal trials. The Washington

patient's therapist could testify under a dangerous-patient exception (because his therapist permissibly had disclosed a communication under state law), while the California patient's psychotherapist would be forbidden from testifying. The Federal Rules of Evidence should apply uniformly and not vary depending on the state in which the defendant resides. *See United States v. DeWater,* 846 F.2d 528, 530 (9th Cir.1988) ("Using federal rules of evidence and procedure and case law promotes the uniform disposition of criminal matters in the federal system."); *see also Lippay v. Christos,* 996 F.2d 1490, 1497 (3d Cir.1993) (discussing "Congress' intent that the Federal Rules of Evidence have uniform nationwide application"); *Boren v. Sable,* 887 F.2d 1032, 1038 (10th Cir.1989) (stating that "the Federal Rules of Evidence are intended to have uniform nationwide application").

The strongest argument in favor of tying a dangerous-patient exception to state laws is that, "when the [psychotherapist] has specifically informed the patient that the [psychotherapist] will not keep the communications confidential, there is no barrier to that person testifying." *Hayes,* 227 F.3d at 587 (Boggs, J., dissenting). The logic of this argument is that, if the patient knows that the psychotherapist can disclose threats to third parties that the patient communicates during treatment, then the patient has no expectation of confidentiality in the first place when communicating the threats; therefore, there is no

reason to treat such communications as "privileged."

This view is a cousin to a common analysis of the waiver of a privilege. As the New York Court of Appeals observed almost one hundred years ago, "when a secret is out, it is out for all time, and cannot be [caught again] like a bird, and put back in its cage." *People v. Bloom,* 193 N.Y. 1, 85 N.E. 824, 826 (1908); *see also* 2 McCormick on Evidence § 93, at 371–72 (5th ed. 1999) ("Finding waiver in situations in which forfeiture of the privilege was not subjectively intended by the holder is consistent with the view, expressed by some cases and authorities, that the essential function of the privilege is to protect a confidence which, once revealed by any means, leaves the privilege with no legitimate function to perform.").

We are unpersuaded by this argument for two reasons. First, it relies to some extent on a fiction that the patient knows that a disclosure for one purpose (warning a potential target of violence) is a disclosure for all purposes (including incriminating testimony in a federal criminal trial).[4] Such a conclusion is not a logical necessity; a communication can be "not confidential" under state law, but still "privileged" under the Federal Rules of Evidence.[5] Second, to the extent that a patient actually does know the law and the rules of evidence, the legal rule itself, whatever it may be, will govern the patient's expectations. If, for example, the operative legal rule is

---

**4.** Because the result is not affected, we assume for purposes of this opinion that all of Dr. Dieter's testimony was privileged. Thus we leave for another day the questions whether a psychotherapist may testify to (a) the existence of a therapeutic relationship; (b) the fact of disclosure of threats as permitted under state law; and (c) the content of that disclosure. We also need not decide whether a person to whom a psychotherapist discloses threats may testify to the existence or content of the disclosure.

**5.** In this case, Dr. Dieter did not inform Defendant that she might testify against him in court, although she did warn him that she would disclose his threats for the purpose of protecting intended victims. We need not decide whether the result would be different if a psychotherapist informed a patient ahead of time that she would testify in court; arguably, the patient in that circumstance would be agreeing that the subsequent communication was not confidential.

that a therapist may disclose threats in order to warn intended victims, but may *not* testify to the threats in federal court— the analogue to the rule in most states— that is the rule that the patient will assume is in effect.

### 3. *The 1972 Proposed Rule*

In 1972 the Chief Justice of the United States, on the recommendation of the Judicial Conference Advisory Committee on the Rules of Evidence, submitted nine proposed testimonial privileges to Congress. *See* Jaffee, 518 U.S. at 8 n. 7, 116 S.Ct. 1923; *see also* Huston Combs, Note, *Dangerous Patients: An Exception to the Federal Psychotherapist–Patient Privilege*, 91 Ky. L.J. 457, 459–60 (2003). One of these privileges, embodied in Proposed Rule 504, was a psychotherapist-patient privilege. Proposed Federal Rules of Evidence, 56 F.R.D. 183, 240–41 (1972). The Proposed Rule establishing that privilege also created three exceptions: proceedings to hospitalize a patient for mental illness, proceedings to examine the mental or emotional condition of the patient, and proceedings in which the patient's mental or emotional condition is relevant to a claim or defense. *Id.* at 241.

Conspicuously absent from the list was a dangerous-patient exception. One commentator has explained that the "omission was deliberate. The exceptions allowed were patterned after those in [a] then-existing Connecticut statute." *Harris*, 74 Wash. L.Rev. at 37. The Proposed Rules cited an article by two authors of the Connecticut statute. *See* 56 F.R.D. at 243–44 (*citing* Abraham S. Goldstein & Jay Katz, *Psychiatrist–Patient Privilege: The GAP Proposal and the Connecticut Statute*, 36 Conn. B.J. 175, 182 (1962)). Professors Goldstein and Katz wrote:

It should be noted that our committee deliberately chose not to write a "future crime" exception into the bill. Its members were persuaded that, as a class, patients willing to express to psychiatrists their intention to commit crime are not ordinarily likely to carry out that intention. Instead, they are making a plea for help. The very making of these pleas affords the psychiatrist his unique opportunity to work with patients in an attempt to resolve their problems. Such resolutions would be impeded if patients were unable to speak freely for fear of possible disclosure at a later date in a legal proceeding.

*Goldstein & Katz*, 36 Conn. B.J. at 188.

As explained by one commentator,

[t]his logic was apparently persuasive to the federal Advisory Committee. As explained by [Weinstein]: "[a]lthough some . . . have argued that the need for disclosure is paramount when possible harm is threatened, [Proposed Rule] 504 proceeds on the assumption that less harm will ensue if patients feel free to ventilate their intentions."

*Harris*, 74 Wash. L.Rev. at 38 (quoting 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 504[05], at 504–27 (2d ed.1996, Release No. 35–8/89)); *see also Harris*, 74 Wash L.Rev. at 67–68 ("The Supreme Court in *Jaffee*, following the lead of the Federal Rules Advisory Committee and state legislatures, made a policy judgment that the value of protecting the confidentiality of the psychotherapist-patient relationship outweighs the evidentiary value of admitting a patient's confidential statements for the purpose of proving criminal conduct by the patient. The powerful and salutary impulse to protect potential victims that gave rise to the *Tarasoff* duty to warn should not be allowed to distort the consistent application of that policy judgment. Indeed, the rationale supporting that judgment includes the belief that protection of the therapeutic relationship will result in less patient violence.").

Of course, Congress ultimately chose to enact the more open-ended Rule 501 rather than the proposed rule. Nevertheless, because "the Supreme Court has officially recognized the psychotherapist-patient privilege, and cited favorably to [Proposed Rule 504] as initially proposed, the contents of the [Proposed Rule] have considerable force and should be consulted when the psychotherapist-patient privilege is invoked." 3 Weinstein's Federal Evidence § 504.02, at 504–7 (footnote omitted).

### 4. Public Policy

Finally, in exercising our common-law function as we consider whether to recognize a dangerous-patient exception under Rule 501, we turn to the policies underlying psychotherapist-patient confidentiality and the states' disclosure exceptions. The confidentiality laws, and the testimonial privilege, are designed to assist the individual patient who has sought help and, on a larger scale, to improve public health. *Jaffee* 518 U.S. at 11–12, 116 S.Ct. 1923. Any exception necessarily has some adverse effect on the candor that the psychotherapist-patient privilege is meant to encourage, because patients will be more reluctant to divulge unsavory thoughts or urges if they know that the therapist may be required to testify about the content of therapeutic sessions.

The justification for the dangerous-patient exception to states' confidentiality rules is, of course, the health and safety of the potential victim of the patient. The potential victim's well-being is as important as that of the patient. The difficult question is how to balance the patient's need for candor, in service of therapy, against the potential victim's need for protection.

As noted, the states have balanced those needs at the time of the threat by requiring, or at least permitting, disclosure to the potential victim and to the authorities.

The issue is somewhat more subtle when we reach the time of a trial at which the threats, originally disclosed during a therapeutic session, are relevant to a federal criminal proceeding. What *marginal* harm is done to the psychotherapist-patient relationship by the additional disclosure, and what *marginal* protection is offered to society?

We know that the initial disclosure to the target or to the authorities can be damaging to the psychotherapist-patient relationship. But we think that a patient will retain significantly greater residual trust when the therapist can disclose only for protective, rather than punitive, purposes. In other words, the marginal additional harm to the relationship is significant. As the Sixth Circuit expressed it:

> [R]ecognition of a "dangerous patient" exception surely would have a deleterious effect on the "atmosphere of confidence and trust" in the psychotherapist/patient relationship. While early advice to the patient that, in the event of the disclosure of a serious threat of harm to an identifiable victim, the therapist will have a duty to protect the intended victim, may have a marginal effect on a patient's candor in therapy sessions, an additional warning that the patient's statements may be used against him in a subsequent criminal prosecution would certainly chill and very likely terminate open dialogue. *See, e.g.*, Gregory B. Leong, *et al.*, *The Psychotherapist as Witness for the Prosecution: The Criminalization of Tarasoff*, AM. J. PSYCHIATRY 149:8, at 1011, 1014 (Aug.1992). Thus, if our Nation's mental health is indeed as valuable as the Supreme Court has indicated, and we think it is, the chilling effect that would result from the recognition of a "dangerous patient" exception and its

logical consequences is the first reason to reject it.

*Hayes,* 227 F.3d at 584–85.

On the other side of the equation, the obvious good afforded by a dangerous-patient exception is that, if psychotherapists were permitted to testify in federal criminal cases to matters discussed with patients during treatment, it is more likely that patients who have threatened others will be convicted. If convicted, the patient may be incarcerated, and incarceration is one way to ensure protection of the intended victim and others. However, the *additional* protection that would come from the psychotherapists' testimony is not as great as it may seem at first blush.

We note, first, that there are many situations in which the privilege simply would not apply at all. For example, if a patient engaged in a criminal act, such as an assault, at the doctor's office, no privilege would apply because the privilege protects only communications. *See Jaffee,* 518 U.S. at 15, 116 S.Ct. 1923 ("[W]e hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence.").

Second, it usually will be the case that there is other evidence of the crimes in question. The privilege does not apply to non-psychotherapists to whom similar threats may have been uttered. *See Jaffee,* 518 U.S. at 9–10, 116 S.Ct. 1923

("[T]he question we address today is whether a privilege protecting confidential communications *between a psychotherapist and her patient* promotes sufficiently important interests to outweigh the need for probative evidence.... Both 'reason and experience' persuade us that it does." (emphasis added) (citation and internal quotation marks omitted)).

Third, the federal testimonial privilege would not apply in state court proceedings, including commitment proceedings.[6] States generally allow psychotherapists to testify in civil commitment proceedings, which are designed in part to detain and deter mentally ill persons who are dangerous. Oregon has such a provision. *See* Or. Evid.Code § 504(4)(d) (providing that there is no privilege for confidential communications, or records thereof, when the statutes pertaining to commitment allow the use of such evidence).

Finally, although incarceration is one way to eliminate a threat of imminent harm, in many cases treatment is a longer-lasting and more effective solution. A criminal conviction with the help of a psychotherapist's testimony is almost sure to spell the end of any patient's willingness to undergo further treatment for mental health problems. *See Hayes,* 227 F.3d at 585 ("Once in prison, even partly as a consequence of the testimony of a therapist to whom the patient came for help, the probability of the patient's mental health improving diminishes significantly....").

On balance,[7] we conclude that the gain

**6.** Proposed Federal Rule of Evidence 504(d)(1) provided: "There is no privilege under this rule for communications relevant to an issue in proceedings to hospitalize the patient for mental illness, if the psychotherapist in the course of diagnosis or treatment has determined that the patient is in need of hospitalization." Proposed Federal Rules of Evidence, 56 F.R.D. 183, 241 (1972).

**7.** We recently examined, en banc, the scope of a habeas petitioner's waiver of the attorney-

client privilege arising from a claim of ineffective assistance of counsel. We held that the waiver extends *only* to the litigation of the federal habeas petition. *Bittaker v. Woodford,* 331 F.3d 715 (9th Cir.2003) (en banc). In holding that a waiver for purposes of the habeas claim did not amount to waiver for all purposes, we "start[ed] by noting that ... we must strike a delicate balance between the interests of the state and those of the federal government." *Id.* at *5. *Bittaker* supports the

from refusing to recognize a dangerous-patient exception to the psychotherapist-patient testimonial privilege in federal criminal trials outweighs the gain from recognizing the exception.

### 5. *Conclusion*

A dangerous-patient exception to the federal psychotherapist-patient testimonial privilege would significantly injure the interests justifying the existence of the privilege; would have little practical advantage; would encroach significantly on the policy prerogatives of the states; and would go against the experience of all but one of the states in our circuit, as well as the persuasive Proposed Rules. We therefore decline to recognize a dangerous-patient exception to the federal psychotherapist-patient privilege.

 Dr. Dieter testified about some of her conversations with Defendant during therapeutic sessions. Because Defendant's statements were made for the purpose of obtaining treatment, and because there is no dangerous-patient exception to the federal privilege that otherwise applies, *see Jaffee*, 518 U.S. at 15, 116 S.Ct. 1923, the admission of Dr. Dieter's testimony about Defendant's communications to her was erroneous.[8]

### D. *The error in admitting Dr. Dieter's testimony was harmless.*

Defendant was convicted only on Count I, the making of a threat against the FBI agents who were en route to his home. This threat was communicated to a telephone operator at Kaiser Permanente. Defendant does not argue that his communications to the operators were confidential or that the operators are subject to an evidentiary privilege.[9] Count I, which involved only the threat that Defendant conveyed to a Kaiser Permanente operator, rested on the operator's testimony.

The threats to which Dr. Dieter testified formed the basis of Count II, on which Defendant was acquitted. We have held that Dr. Dieter's testimony was admitted in violation of the federal psychotherapist-patient privilege. Our remaining task is to determine whether that error was harmless.

Because the answer will affect our harmless-error analysis, we pause to consider whether the evidence of other threats was properly admitted in the gov-

---

notion that a waiver of a privilege in one context does not necessarily mean extinguishment of the privilege for all time and in all circumstances.

8. The government invites us, in the alternative, to hold that Defendant's threats were not privileged because they fall under a crime/fraud exception to the psychotherapist-patient privilege. *See In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 77 (1st Cir.1999) (holding that a crime/fraud exception applies to the psychotherapist/patient privilege and that statements are not privileged if they were made "to promote a particular crime or fraud" or were "intended directly to advance a particular criminal or fraudulent endeavor" instead of to serve the goals of legitimate therapy). We have not determined whether such an exception exists.

We need not decide the question here, because Defendant's statements to his therapist would not qualify under such a standard, even if we adopted one. Defendant did not make his threats with the intention of promoting or directly advancing the commission of a future crime. (Indeed, the jury found that the threats were not a past crime, either.) Defendant's purpose was to obtain treatment for his mental illness; that is, Defendant's revelations were made in pursuit of the goals of legitimate therapy. *See Chase*, 301 F.3d at 1025 n. 3 (explaining that Defendant's "statements to Dr. Dieter were ... well within the scope of legitimate therapy").

9. Accordingly, we leave for another day the question whether such communications fall within the psychotherapist-patient privilege.

ernment's case concerning Count II. We believe that it was, for the reasons stated in the three-judge panel's opinion. *Chase,* 301 F.3d at 1026–31.

■ "[H]armless error analysis applies to the improper admission of evidence, and reversal is proper only if the government cannot show that the error was more probably than not harmless." *United States v. Beckman,* 298 F.3d 788, 793 (9th Cir.2002). Because a violation of the psychotherapist-patient privilege is not a constitutional error, the government must show that the prejudice resulting from the error was "more probably than not harmless." *See United States v. Bauer,* 132 F.3d 504, 510 (9th Cir.1997). To meet that standard, the government must "show a fair assurance that the verdict was not substantially swayed by the error." *Id.* (internal quotation marks omitted).

■ We are satisfied that the admission of Dr. Dieter's testimony was harmless error. The jury acquitted Defendant on Count II, which related to the threats that Defendant communicated to Dr. Dieter during therapeutic sessions, a result that suggests, at a minimum, that she did not influence the jury unduly. Dr. Dieter's testimony had no bearing on Count I, on which the jury convicted Defendant. Count I arose entirely from Defendant's expression of threats to a Kaiser Permanente telephone operator. On this record, we believe that the result on Count I surely would have been the same even without Dr. Dieter's testimony. That being so, the erroneous admission of her testimony did not prejudice Defendant.

AFFIRMED.

KLEINFELD, Circuit Judge, with whom Circuit Judges T.G. NELSON and CLIFTON join, concurring in the result:

I concur in the result, that the conviction should be affirmed. If there were error, it would be, as the majority concludes, harmless. I dissent from the majority's view that the psychotherapist-patient privilege applies even to a patient's imminent, seriously intended, and properly disclosed threat to commit murder.

It is important to make clear what this case is not. The majority decision does not preserve confidentiality in therapeutic relationships. This is not a case about a patient who says to his psychotherapist "I have homicidal thoughts and feelings, and although I am not going to act on them, they disturb me and I need your help to get rid of them." This case involves a patient who says "I am going to kill FBI agents," has engaged in preparation and has the means to do so, and is understood by the psychotherapist to be voicing a serious intention to act imminently. The patient was understood by his psychotherapist to be past the point of seeking help that would prevent criminal action, so she felt it essential to warn his prospective victims and did so. His therapeutic confidentiality was gone.

No doubt many patients' disclosures to psychotherapists would sound alarming were they repeated in court, and yet would not be "true threats." But here, appellant does not put at issue whether he made a "true threat," [1] both in what he said to his psychotherapist, and what he said to the clinic operator. One might perhaps argue that statements made to a psychotherapist or her staff in the course of obtaining therapy cannot constitute a threat to federal officials under the statute of conviction, [2] but that argument has not been

---

**1.** *See Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

**2.** 18 U.S.C. § 115(a)(1)(B).

made in this case, so we do not speak to it. Once it is assumed, as in this case, that a true threat to kill FBI agents made to a third party constitutes the crime, it follows that the psychotherapist observed the patient committing a crime in her office, just as she would have if she had seen the patient steal her receptionist's purse on the way out. As a percipient witness to a felony, she ought to be required to testify to what she perceived.

The case is controlled by federal common law. Psychotherapists' ethical obligations regarding patients' rights to privacy are not the same thing as federal evidentiary privilege. Psychotherapists' duties of confidentiality, and tort duties to potential victims of patients are also distinct from federal evidentiary privilege. These are matters of professional ethics and state law. Both have some relevance, because they educate us on what is generally expected of psychotherapists in therapeutic relationships with dangerous patients, but neither is controlling. As the Sixth Circuit has held, the connection between a state law duty to inform a prospective victim of a threat has only a "marginal connection, if any at all" to the federal evidentiary question of the scope of the psychotherapist patient testimonial privilege.[3] The controlling Federal Rule of Evidence, Rule 501, provides that except as the Constitution, *federal* statutes, or *federal* rules may otherwise provide, and except for certain civil cases, "the privilege of a witness … shall be governed by the principles of the *common law* as they may be interpreted by *courts of the United States* in the light of *reason and experience.*"[4] Thus the extensive state authorities relied upon by the majority as a basis for decision, are, as a matter of law, *prohibited* to us as a controlling basis for decision. Of course we look to state authorities, both statutes and judicial decisions, for guidance insofar as they shine the "light of reason and experience" on the question,[5] but we must be "governed," Rule 501 says, by federal judicial decisions on the common law of privilege.

There is already a circuit split on whether there is a dangerous patient exception to the federal psychotherapist-patient privilege, as the majority recognizes.[6] The Tenth Circuit in *United States v. Glass*[7] held that a psychotherapist may testify about a patient's threat if it was serious when made and disclosure was the only means of averting harm. The Sixth Circuit in *United States v. Hayes*[8] held that there is no dangerous patient exception. The First Circuit in *In re Grand Jury Proceedings (Gregory P. Violette)*[9] held that the crime or fraud exception to the attorney-client privilege applies to the psychotherapist-patient privilege.

**3.** *United States v. Hayes,* 227 F.3d 578, 583 (6th Cir.2000).

**4.** Fed.R.Evid. 501 (emphasis added).

**5.** Fed.R.Evid. 501. *See also Jaffee v. Redmond,* 518 U.S. 1, 12–13, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (policy decisions of states "bear" on recognition of federal privileges).

**6.** *See In re Grand Jury Proceedings (Gregory P. Violette),* 183 F.3d 71, 74 (1st Cir.1999) (finding crime-fraud exception to privilege) and *United States v. Glass,* 133 F.3d 1356, 1360 (10th Cir.1998) (therapist may testify if threat was serious and disclosure was the only means of averting harm); *but see United States v. Hayes,* 227 F.3d 578, 579 (6th Cir. 2000) (no dangerous patient exception to psychotherapist-patient privilege).

**7.** 133 F.3d 1356, 1360 (10th Cir.1998).

**8.** *United States v. Hayes,* 227 F.3d 578 (6th Cir.2000).

**9.** 183 F.3d 71 (1st Cir.1999).

The Supreme Court has spoken expressly to the issue in this case, saying that the privilege does not apply in cases such as the one before us. The only reason we have any room to opine to the contrary, as the majority does, is that the Court spoke in dicta. The holding in *Jaffee v. Redmond*[10] is that there is indeed a psychotherapist privilege under Rule 501. The dictum critical to this case is a footnote, in which the Court says **"we have no doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."**[11]

The case before us is precisely the one described in the *Jaffee* footnote. The Supreme Court has said in the plainest English that in cases such as the one before us, "the privilege must give way." We ordinarily treat Supreme Court dicta with "due deference"[12] even though they are not binding. Because we are to interpret those decisions "in the light of reason and experience," the Supreme Court's dictum should speak even more persuasively than usual, since, dictum or not, what the Court says reflects its "reason and experience."

The words "the privilege must give way" do not mean that "the right to out-of-court confidentiality must give way," or that "the right to confidentiality is superseded by the duty of out-of-court disclosure to the prospective victim." They mean what they say, that what must "give way" is the "privilege." The "privilege" is the privi-

lege not to testify in federal court. There is only one way to read the plain English of the *Jaffee* footnote, and that is that the privilege of a psychotherapist to refuse to testify in federal court, or her patient's privilege to bar her testimony, does not exist "if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."[13] That is, when the serious threat occurred that could be averted only by disclosure, the privilege died.

The majority attempts to resuscitate the privilege not to testify. The privilege breathed its last when the "serious threat of harm" could be and was "averted only by means of a disclosure by the therapist."[14] Artificial respiration of a privilege dead under Supreme Court language that speaks directly to it takes a miracle.[15] I do not think the majority brings it off. It says "[w]e read that footnote as endorsing—albeit elliptically—a duty to disclose threats to the intended victim and the authorities...."[16] The majority's adverb, "elliptically" means "[m]arked by obscurity of style or expression."[17] "The privilege must give way" is not obscure. Any lawyer knows what the word "privilege" means. The context of the *Jaffee* footnote was the patient's privilege to bar her psychotherapist's testimony in federal court under Federal Rule of Evidence 501. The majority makes the surprising supposition that "the *Jaffee* footnote was intended to extend [state requirements of disclosure of threats] to psychotherapist-patient relationships to which federal law applies (such

---

**10.** 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

**11.** *Jaffee*, 518 U.S. at 18, n. 19, 116 S.Ct. 1923 (emphasis added).

**12.** *United States v. Baird*, 85 F.3d 450, 453 (9th Cir.1996).

**13.** *Jaffee*, 518 U.S. at 18 n. 19, 116 S.Ct. 1923.

**14.** *Id.*

**15.** *Cf.* 2 Kings 4:31–37.

**16.** Majority Op. at 984.

**17.** *The American Heritage Dictionary* 446 (2d ed.1982).

as treatment by federally employed psychologists at overseas army hospitals)."[18] There is nothing in *Jaffee* to support that remarkable speculation.

The majority reads the words "the privilege must give way" to mean that *the privilege* does *not* give way, and what does give way is the psychotherapist's duty to keep the patient's communication secret from the prospective victim. But that is not what the Court said. And it makes no sense to say, as the majority apparently does, that the Court was speaking to the issue of whether a psychotherapist may disclose a serious threat to the prospective victim, rather than whether the psychotherapist may testify in court about it. *Jaffee* raised only the issue of testimonial privilege, not the issue of disclosure. The issue of testimonial privilege, to which the Court expressly spoke, is a federal common law issue under Federal Rule of Evidence 501. The issue of duty to disclose to the prospective victim is a state tort law issue, not a matter of federal law, and not within the scope of *Jaffee*. There is just no getting around the proposition that *Jaffee* said, and meant, that the psychotherapist-patient "privilege must give way," referring to the privilege under Rule 501 to refuse to testify.[19]

But I concede that the Court's remark does not bind us, because it is dictum (though it has the look of a footnote added to avert a risk that someone in the majority perceived were the opinion published without it). So let us turn to "reason and experience," as Rule 501 commands. As the majority concedes, the states are divided with California recognizing a dangerous patient exception to the privilege and others not. The majority rejects any such exception on policy grounds, arguing that once the psychotherapist warns the prospective victim, there is little social value in obtaining the psychotherapist's testimony and much value in excluding it to preserve a therapeutic relationship.

This argument is not compelling. In the case at bar, the psychotherapist told the patient, when he first voiced threats, that she would have a duty to disclose threats he made. Subsequently, she did disclose them to the FBI as she told him she would. This patient plainly did not need an assurance of confidentiality to speak honestly to his psychotherapist about what he felt and what he planned to do about his feelings. Nor did he have one. The psychotherapist had told him his threatening communications would be disclosed. In my view (as in the view of the dissenting judge in the Sixth Circuit case in similar circumstances)[20] this case could be simply and properly resolved on the ground that by communicating after the psychotherapist had told him she would not keep the communications secret, appellant waived the privilege. Communicating to a psychotherapist on express terms that the communication will be disclosed is an unprivileged medical communication, much like communication by a plaintiff to a defense physician under Federal Rule of Civil Procedure 35.

The majority opinion notes the distinction between disclosure to the prospective victim and testimony in court, but draws the wrong inference from it. The majority concludes that the privilege remains in force even though disclosure is made,[21] but that does not make much sense. Once disclosure is made, the patient has lost the medical benefit of being able to speak to his psychotherapist in confidence that

---

**18.** Majority Op. at 984, n. 2.

**19.** *Jaffee*, 518 U.S. at 18 n. 19, 116 S.Ct. 1923.

**20.** *United States v. Hayes*, 227 F.3d 578, 588 (6th Cir.2000) (Boggs, J., dissenting).

**21.** Majority Op. at 979.

what he says will remain secret. His communications are disclosed, and he knows it. His hated enemy, whom he plans to kill, is now privy to his communication to his psychotherapist. Once the person the deranged individual hates so much that he plans to kill him knows his secrets, and the deranged individual knows that his psychotherapist refuses to keep his secrets from that person, there is not much therapeutic value in refusing later to tell this already-disclosed information to the judge and jury. After all, the deranged person does not hate them and his confidentiality is long gone. The majority is evidently concerned about deranged murderous individuals stopping valuable therapy because the psychotherapist reveals their confidences. But where that will occur, it will doubtless already have occurred where the psychotherapist betrayed their confidences to their worst enemies.

Psychiatry and psychotherapy are often of great value, and rely for their value on open and candid communication by the patient. I have no doubt that testimony by psychotherapists against their patients, or for that matter disclosure to prospective victims by psychotherapists, harms the therapeutic relationship. But the therapeutic relationship is not the only social value at stake. The prospective victims' lives are at stake.

Sometimes a warning may suffice to protect the victim, sometimes not. FBI agents, the prospective victims in this case, carry guns and know how to use them, so perhaps they (but not their spouses and children) could protect themselves if they know who to look out for. But most people cannot. What, exactly, is one to do if a psychotherapist calls up and says "I have a deranged patient who plans to kill you, and he's serious?" Call the police? They do

not provide bodyguard services. Seek state civil commitment proceedings, as the majority opinion suggests? How shall the threatened individual assemble the money for lawyers and experts and persuade the involved bureaucracies and individuals to act fast enough to prevent realization of the threat? The fastest way to get someone locked up who threatens to kill a federal official in violation of the statute of conviction may well be a federal criminal proceeding in which the psychotherapist testifies about what the patient says.

Protecting federal officials from assassination is only part of the purpose of the law. The statute criminalizing threats against federal officials [22] is not merely prophylactic, to prevent the harms threatened. It prohibits the threats themselves. Federal officials, high and low, are supposed to be able to do their jobs, not only without being killed, but also without facing death threats. The threats themselves inhibit the efficient functioning of government. Suggesting, as the majority opinion does, that threatened officials try to get the threateners civilly committed does nothing to alleviate the interference with government functioning caused by threats.

Beyond these practical concerns, there is another concern, altogether ignored by the majority opinion. That is the concern with having the truth vindicated and justice done. The tradition of the common law, as Wigmore teaches, is that privileges are "distinctly exceptional, being so many derogations from a positive general rule" that "the public ... has a right to every man's evidence." [23] The reason that the states found it necessary to provide by statute for a physician-patient privilege is that Lord Mansfield, in the Duchess of

---

**22.** 18 U.S.C. § 115.

**23.** 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2192, at 70 (John T. McNaughton rev., 1961).

Kingston's Trial (a House of Lords trial for bigamy) had rejected it as a matter of common law.[24] In the 1600's "the obligations of honor among gentleman" was often sufficient ground for refusing to testify, but in the same "notorious Duchess of Kingston's Case" in 1776, "the older point of view was definitely abandoned and the new one thoroughly promulgated."[25] The common law preference is for the truth coming out, rather than privilege.

The question for the jury in this case was whether Steven Gene Chase did or did not make true threats to kill FBI agents. As in any trial, little can be more important than that the verdict be true. That is why we call it a "verdict," derived from Latin roots for "true speech." Although in this case the verdict would plainly be true even were the trier of fact deprived of the psychiatrist's testimony, in many cases that will not be so. Where the patient does not pose so serious a threat of harm that the psychiatrist realizes disclosure is needed to avert the threat, the risk of a false verdict may be worth taking for the social benefit of the therapy. That is the policy rationale for the holding in *Jaffee*.

But this is a case where the threat was understood by the psychiatrist to be so serious as to require disclosure, and she had disclosed what her patient told her. The confidentiality of the therapeutic relationship had already been breached, and the patient knew it. Where disclosure was necessary, the social interest in assuring that the judge and jury know the whole truth greatly exceeds the value of preserving any remaining shreds of the confidential therapeutic relationship. The jury ought, in such circumstances, to know the truth about what Chase said. The cat being already out of the bag, trial is no occasion for stuffing it back in.

---

24. *Id.* § 2380 at 818.

25. *Id.* § 2286 at 531.